KONRAD, Appellant, vs. ZIMMERMANN and another, Respondents.

*March 2 — March 17, 1891.*

DEED: *Setting aside for undue influence.*

Where, in an action to set aside a deed from plaintiff to his step-son, on the ground of undue influence, it appeared that, some disagreement having arisen between them, the latter had commenced a suit against the former for wages since he became of age, and that, by the advice of a neighbor, the plaintiff had settled such suit by executing a will in favor of such step-son and his brother and their mother, by which all parties were apparently satisfied, but soon afterward the plaintiff proposed to change that arrangement, and did do so by executing a deed to defendant, taking back a bond for support, both drawn by defendant's attorney in English, which language plaintiff could not read nor understand, and he being old and feeble in mind, and having no one to advise him; and that he expressed great dissatisfaction when he learned the effect of the papers, — *held*, that there was sufficient evidence of undue influence to require that the deed be set aside.

APPEAL from the Circuit Court for *Washington* County. The case is fully stated in the opinion.

*P. O'Meara*, for the appellant, claimed that the defendant was living in the plaintiff's family merely as a member of the family, and never claimed wages until after the plaintiff refused to lease the farm to him, and had revoked his will, and that he was not entitled to wages. *Bostwick v. Estate of Bostwick*, 71 Wis. 273; *Geary v. Geary*, 67 id. 248. The circumstances under which the plaintiff, being old and feeble, was induced to execute the will and subsequently the deed, without consulting an attorney or any of his friends, the latter paper being drawn by defendant's attorney, require that the transaction should be strictly scrutinized. They show undue influence. That is also shown by the gross inadequacy of the consideration. *Voell v. Kelley*, 64 Wis. 504; *Watkins v. Brant*, 46 id. 419; *Bussian*

Konrad vs. Zimmermann and another.

*v. M., L. S. & W. R. Co.* 56 id. 325; *Lefebre v. Dutruit,* 51 id. 334; *Risch v. Von Lillianthal,* 34 id. 250; *Kuelkamp v. Hidding,* 31 id. 503; Pomeroy, Eq. Jur. sec. 947 and notes; Bishop on Cont. sec. 736; *Gay v. Gillilan,* 1 Am. St. R. 712; *Garvin's Adm'r v. Williams,* 100 Am. Dec. 314; *Fisher v. Bishop,* 2 Am. St. R. 357, and note.

For the respondents there was a brief by *Barney v. Kuechenmeister,* and oral argument by *S. S. Barney.* They contended that the settlement of defendant's suit was the highest kind of a consideration for the papers executed by plaintiff. *Kercheval v. Doty,* 31 Wis. 476; *Case v. Fish,* 58 id. 56; *Miller v. Chippewa Co.* 58 id. 630. Such a settlement should not be opened except upon the most positive and satisfactory evidence. *Lavassar v. Washburne,* 50 Wis. 200; *Le Saulnier v. Loew,* 53 id. 207; *Lake v. Meacham,* 13 id. 355; *Fowler v. Adams,* 13 id. 458; *Newton v. Holley,* 6 id. 592. Even a contract with a person *non compos mentis* will not be set aside if beneficial to him, where there was no lack of good faith in the other party. *Encking v. Simmons,* 28 Wis. 280; 1 Story, Eq. Jur. secs. 227–233, 234–238; *Tracy v. Sacket,* 1 Ohio St. 54.

TAYLOR, J. This action was brought by the appellant to set aside a conveyance of real estate made by him and the said *Maria Konrad* to the respondent *Emil Zimmermann,* bearing date March 22, 1889, for 100 acres of land, and also certain personal property, consisting of horses, cattle, and farming implements. The facts bearing upon the transaction sought to be set aside and avoided by the plaintiff, on the ground of fraud and undue influence, are briefly the following:

In 1874 the plaintiff was a widower, and owned the land in question. He had several children by a former wife, but they had all grown up, and had left his home, and were supporting themselves. The plaintiff at that time married

the said *Maria*, who was then a widow having five children, the eldest being *Emil*, the respondent, who was then in his thirteenth year. The others were much younger. *Maria* had very little property of any kind, certainly not exceeding $150 in all. Immediately after their marriage, in 1874, the plaintiff took his wife and five children to his home on his farm. He supported the children from that time until they were grown up, and the two boys, *Emil* and his brother, have always since the marriage lived on said farm, and assisted in working and carrying on the same, and having their support and maintenance therefrom. There seems to have been no trouble in the relations of the family until some time in the fall of the year 1888. Shortly after *Emil* came of age his step-father hired him and paid him wages for a few months at the rate of $15 per month, and at the expiration of his time the father declined to hire him for wages longer, and as he says told *Emil* he could not pay him wages longer, and that he might go. But *Emil* remained and worked as he had done before, getting his living and clothing, and small amounts of spending money, as he had before he became of age.

It also appears in the evidence that some time in 1879, when the plaintiff was injured and unwell, he made a will by which he devised and bequeathed the farm and all his personal property to his wife, *Maria*, and constituted her the sole executrix of his said will. This devise was subject to the payment of $25 each to his four children by his former wife. As said above, the family lived in peace and apparent contentment together on the farm until the fall of 1888. At that time *Emil*, it seems, was not satisfied with the way he was living and working on the farm, and desired to rent the farm and work it himself. There was some trouble grew out of this. The father, it seems, did not like the idea of giving up the control of the farm to his step-son *Emil*. It is also probable from the evidence that

*Emil,* and perhaps *Maria,* his wife, had discovered that the plaintiff had destroyed the will made in 1879. The evidence tends to show that, during the winter of 1888–89, there was considerable bad feeling between the members of the family, and at times quarrels, and early in March, 1889, *Emil* demanded of his step-father that he should pay him wages for his work on the farm since he came of age. This the step-father refused to do, and *Emil* then threatened to sue him for such wages, and after some contention about the matter *Emil* commenced a suit against his step-father for his wages, and claimed in said action the sum of $1,200. Barney & Kuechenmeister were his attorneys in said action. Immediately upon being threatened with a suit by *Emil,* the plaintiff consulted with Dow Maxon, a neighbor, in whom he seemed to have confidence, as to what he should do in the matter. Mr. Maxon advised him to do nothing until an action was commenced. After the action was commenced, Mr. Maxon came to the house of the plaintiff, and there, in the presence of *Emil* and the rest of the family, induced the plaintiff to produce the old will, which then appeared to have been destroyed by removing the names of the testator and of the witnesses. Mr. Maxon advised the plaintiff to make some arrangement with *Emil* which would be satisfactory to him and to the rest of the family, and with that view, on the 18th day of March, 1889, he induced the plaintiff to make another will, which he drew, and which was duly signed by the plaintiff, and properly witnessed. The following is a copy of this will:

" I, *Frank Philip Konrad,* of the town of Polk, Washington county, and state of Wisconsin, mindful of the uncertainties of life, do make this, my last will and testament, in the manner following: (1) After paying my just debts and funeral expenses, I give to my following named children each ($25) twenty-five dollars: Elizabeth Zeagenbean, of Appleton; Maria Oppermann, of town Polk; Frank

Konrad, Sturgeon Bay; and Katherine Benake, Washington county. (2) All the rest of my estate, both real and personal, I give to my wife, *Maria Konrad*, to have and to hold so long as she may live, for her sole benefit and use, and upon her death to be divided equally between her two sons, namely, *Emil Zimmermann*, of the town of Polk, Washington county, Wisconsin, and Bruno .Zimmermann, of the same place. (3) I nominate and appoint Benjamin Turck, of the town of Polk, executor of this my last will and testament, and hereby authorize him to compound and settle any claim and demand against or in favor of my estate. Dated this 18th day of March, 1889. In witness whereof I have hereunto set my hand and seal, this 18th day of March, 1889. · FRANZ PH. KONRAD. [Seal.]

" This instrument, written on both sides of one sheet of paper, was signed by this said testator, and declared to be his last will and testament, in the presence of us, who have signed our names at his request as witnesses, in his presence, and in the presence of each other.

" FRED PATOW, of Cedar Creek, Wis.

" DOW MAXON, of Cedar Creek, Wis."

At the same time Mr. Maxon drew up the following contract, which was duly signed by the plaintiff: " It is hereby agreed between *Frank Philip Konrad*, party of the first part, and *Emil Zimmermann*, and his brother, Bruno Zimmermann, parties of the second part, that in full consideration of their services already rendered, and services that may hereafter be rendered, the party of the first agrees and promises to secure to each of them ($500) five hundred within six months after his death, and therefore to enter into a proper contract to be drawn by S. S. Barney, obliging his administrators, executors, or assigns to pay to the parties of the second part the above amount as stated. Dated this 18th day of March, 1889. FRANZ PH. KONRAD."

*Emil*, the respondent, was present when these papers

were drawn and executed, and the witness Maxon says it was understood between the father and the boys that some other writing should be drawn by Mr. Barney, one of the attorneys for *Emil*, to secure to the boys the performance of the contract last above quoted, and that when that was done it would settle the matters between Emil and his father. Mr. Maxon also testified that he communicated with Mr. Barney in relation to his drawing the writing to secure the performance of said contract. Mr. Maxon testified, also, that the plaintiff seemed anxious to keep his property as long as he lived, but that he was willing to pay *Emil* for his work.

Mr. Grule, a witness for the plaintiff, testified that on the 19th or 20th of March, 1889, he talked with *Emil:* "The boys says the old man makes some paper out at the creek. Maxon made it. I get $500, *Emil* says, and my brother gets $500. We agree together to rent the land the first year. In the fall we make a new bargain with him. Then he made his will. After he is dead it over to him (*Emil*), only he is boss,— the old man,— as long as he live. *Emil* says: The first time he didn't give not $300, now he gives $500, and my brother gets, afterwards the old man is dead, $500. I told him, that's good. He says that's his opinion. The first time he didn't give me $300, now I get $500. Sometimes looks like he crazy. Maybe he is crazy. Maybe he will be." This evidence of the witness Grule is not disputed or denied by the plaintiff, and I quote it for the purpose of showing that what the witness Maxon testified to as to the arrangement made between the parties was understood by *Emil* at the time, and consented to by him, and it also confirms the statement made by Maxon that the old man was anxious to retain control of matters as long as he lived. There is other evidence in the case showing that the plaintiff was disturbed in his mind about his affairs, and since the fall of 1888

there had been trouble, from time to time, about his domestic affairs. Even his wife testifies that at one time he was away from home three days and nights and stayed in the woods. There is also evidence that the old man was offended with Mr. Barney's firm for suing him.

The defendant claims that the plaintiff, without any importuning on his part, after signing the papers drawn by Mr. Maxon to settle the matters, proposed to change the whole thing, and deed the farm to him, and sent to Maxon's to get the papers he had drawn, and, when they were brought to the house, he directed them to be put in the stove, and that they were brought to the house. On the same day they went to West Bend, and had the deed and other papers drawn, which the plaintiff now seeks to set aside. The papers Maxon drew were not put into the stove, but they were laid aside, and were not taken to West Bend, and the plaintiff had never afterwards asked for them. Maxon testifies that it was his intention to be present at West Bend when the paper was to be drawn up to secure the performance of the contract he had drawn for the parties, and would have been there had he known that the parties were at Mr. Barney's for the purpose of settling these matters.

The evidence shows that no one was present at Mr. Barney's office to act as adviser on the part of the plaintiff when the papers were executed there, and Mr. Kuechenmeister, who drew the papers, states that much of the directions for drawing them came from *Emil*, although he testifies that every part of the papers was fully explained to the plaintiff before he signed them, and that he thinks he fully understood their provisions, and freely assented to them. The evidence, however, shows that the papers were written in English, and that the defendant could neither read, write, nor understand that language, and he necessarily must have depended entirely upon Mr. Kuechen-

meister's translation of the same into German for the information of the plaintiff. The evidence also discloses some things which happened shortly after the papers were executed, which tend to indicate that the plaintiff did not fully comprehend the legal effect of the papers he had signed, and seemed to be greatly disappointed and distressed to learn that he had no further control of the personal property on the place, especially the stock.

We think it unnecessary to make further comment upon the evidence, except to say that we think it does not fairly support the following findings of fact by the learned circuit judge, viz.:

"(6) That at about the time the said *Emil* became of age said plaintiff promised to pay him wages, if he would remain with him and continue to work said farm, and that said defendant *Emil*, because of said promise, remained with said plaintiff, and worked his farm until it was deeded to him as hereinafter mentioned, to wit, for about six years, but that he received no part of his wages, except his necessary clothing and a trifling spending money.

"(7) That on the 15th day of March, 1889, said *Emil* commenced an action in the circuit court of Washington county against said plaintiff by the service of a summons and verified complaint, wherein he claimed that $1,200 was due him from said plaintiff as wages for such service.

"(8) That after the commencement of said action by said *Emil* said plaintiff proposed to and did agree with him to deed him said farm, and to give him certain personal property, and to accept, in consideration thereof, the settlement of said suit, a contract for life-support for himself and wife, and the payment of certain sums of money to the persons and at times mentioned in the written contract hereinafter mentioned.

"(9) That the terms of said settlement were fully considered by all the parties thereto before the same were

finally consummated, and that said plaintiff had consulted with and taken counsel from his friends regarding the same."

" (12) That such settlement of said suit, the making of the transfers of said property and of said contract, were fairly conducted by all the parties thereto; that plaintiff was then and there fully advised as to his conduct, and the effect of said settlement, and the instrument executed; that he was free from any undue or wrong influence whatsoever, and that neither said *Emil* or said *Maria* practiced upon him any fraud or undue influence, nor did any one for or in their behalf; that said plaintiff, at the time the terms of the said settlement were agreed upon between him and the said *Maria* on the one part, and said *Emil* on the other, and at the time they were reduced to writing and executed by said parties, respectively, said plaintiff was in possession of all his mental faculties, and competent to make said deed, and enter into said agreement, and that said deed and contract are his free act and deed."

" (13) That the terms and provisions and settlement were just and fair towards said plaintiff, and that neither said *Emil* nor said *Maria* obtained any undue advantage thereby."

While we do not claim that there is no evidence which tends to support all the findings of fact above quoted, we think it is a question of some doubt, at least, whether any of them are fully sustained by the evidence, and as to the ninth, twelfth, and thirteenth findings we are well satisfied that they are not supported by the preponderance of the evidence in the case. The fact that the plaintiff, under the advice of his friend, in whom he seemed, at least, to have confidence, made the contract with *Emil* for the settlement of their trouble, and which all the evidence shows was apparently satisfactory to the plaintiff, and at least not unsatisfactory to *Emil*, and which certainly was a much better

contract for the protection of the plaintiff than the one he entered into within four days thereafter, without the advice of any person present and acting for him, and which was drawn up in the presence of the defendant, by his attorney, and mostly at his dictation, is strong evidence that some improper influence was operating on the mind of the plaintiff, which induced him to execute said deed, and accept the contract and mortgage which constituted the settlement now brought in question. And this conclusion is confirmed by the fact that very soon after he made this last settlement, and when he realized the legal effect of it, he manifested great dissatisfaction in regard to it. The vacillating conduct of the plaintiff in regard to his affairs, both before and after the settlement was made, shows that his mental faculties and judgment were weakened by the infirmity of age or disease, and, to our minds, rendered it unwise for him to act in so grave a matter as the execution of the papers in question, without the advice and counsel of some one in whom he had confidence, acting on his behalf.

The facts of this case are of a similar nature to those existing in the case of *Watkins v. Brant*, 46 Wis. 419, and what was said in that case by the late learned chief justice on pages 428, 429, of the impropriety of an attorney obtaining a settlement of a litigation, acting on the part of his client in the absence of any one to counsel or advise the adverse party, is to some extent, at least, applicable to the case at bar. In the case at bar the firm of attorneys, one of whom drew the papers in this case and obtained the signature of the plaintiff to the same, were prosecuting an action in favor of the defendant against the plaintiff, upon a large claim, and one which, if made successful to its full extent, would have greatly embarrassed the plaintiff at his time of life, if it would not have absolutely ruined him financially. Under such circumstances, and considering the other influences surrounding him, no contract made by the plaintiff which

was not essentially a fair, honest, and on the whole a beneficial one to him, ought to be sustained, and, as we have said above, upon the whole evidence in the case, we cannot agree with the learned circuit judge "that the terms and provisions and settlement were just and fair towards said plaintiff, and that neither the said *Emil* nor said *Maria* obtained any undue advantage thereby."

As this court did in the case of *Watkins v. Brant, supra,* we must hold that the deed, contract, and settlement should have been set aside for undue influence.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded with directions to the circuit court to enter a judgment in favor of the plaintiff, declaring the said deed of the plaintiff to the defendant void; and also to vacate and set aside the contract executed by *Emil* to the plaintiff, and the mortgage to secure the performance thereof, as well as the discontinuance of the action of *Emil* against the plaintiff.