BISHOP, Appellant, vs. BISHOP and others, Respondents.

*February 12—March 9, 1920.*

*Compromise and settlement: Adjustment before action brought: Misrepresentations: Reliance: Settlement in absence of attorneys.*

1. Though a quitclaim deed by which an intervening defendant transferred a $12,000 interest in his father's estate to the plaintiff, his brother, for $400 may have been procured by fraud and undue influence, a settlement between the brothers before the commencement of litigation to determine the validity of the deed, pursuant to which settlement plaintiff paid intervener $5,600 in addition to such $400, was binding, and not the result of undue influence and misrepresentation of a material fact.
2. Such a settlement was not void because made in the absence of the attorneys of the brother who gave the deed and finally agreed to take $6,000 for a $12,000 interest in the estate which was conveyed by the deed.

APPEAL from a judgment of the county court of Iowa county: J. B. SIMPSON, Judge. *Reversed.*

Action to set aside a deed on the ground of fraud and undue influence, the issue being tendered by answer and counterclaim in an action for partition. The following are the facts: James S. Bishop died intestate in Iowa county, Wisconsin, in the year 1895, seized of 280 acres of land in that county. He left surviving his widow, Mary S. Bishop, and five children, *Richard*, Alfred, *Augusta, Frederick*, and *Horace V.* In 1905 Mary S. Bishop, the widow, died intestate, leaving her surviving as her sole and only heirs at law her five children above named. In 1917 the son Alfred died intestate. He was unmarried, and left him surviving as his only heirs at law the three brothers and sister above named. After the death of James S. in 1895, his wife, Mary S., and the three children, Alfred, *Augusta,* and *Frederick,* remained in possession and continued to occupy the

farm until 1905, and thereafter the premises remained in the possession of the three children, Alfred, *Augusta,* and *Frederick,* until Alfred's death in 1917.

On the 4th day of May, 1881, *Richard Bishop* executed to James Bishop, his father, a quitclaim deed of the premises above mentioned. It was believed by *Richard* as well as by each and every member of the family that by such quitclaim deed *Richard* cut himself off from his heirship therein.

Sometime in the month of September, 1918, *Horace V. Bishop,* with a view of bringing partition proceedings, consulted a lawyer to examine the title. The lawyer advised *Horace* that the deed of 1881 did not operate to deprive *Richard* of his rights in the premises as an heir of his father. This was a surprise to *Horace,* and it is doubtful whether he believed it. He soon thereafter went to Oxford, Nebraska, where *Richard* lived with his daughter and her husband, and for $400 secured from *Richard* a quitclaim deed of the premises and an assignment of all his interest in Alfred's estate. It is claimed that this deed was procured by fraud and undue influence. It is certain that at this time *Richard* was under the impression that he owned no interest in the premises, believing that the deed of 1881 operated to deprive him of any right therein. *Horace* then commenced an action of partition against *Augusta* and *Frederick,* claiming a one-half interest in the premises, and alleging that *Frederick* and *Augusta* owned a one-fourth interest each. *Frederick* and *Augusta* answered, denying that *Horace* had any interest in the farm, claiming that he had received his share of the father's estate, specifically denying that he was the owner of a one-half interest in any event, and alleging that said *Horace Bishop* had no right, title, or interest in the premises.

On the 25th of November, 1918, the court made findings declaring the rights of the parties to the action, wherein it

was found that *Horace* was the owner of a one-half interest in the real estate, and the premises were ordered sold. On the 11th day of January, 1919, the premises were duly sold, report of such sale made to the court, and notice that an application for the confirmation of the sale would be made on the 23d day of January, 1919, was served on the attorneys for *Frederick* and *Augusta*. The hearing of this application was successively adjourned until the 25th day of February, 1919. Upon this date *Richard Bishop,* through his attorneys, Fiedler & Fiedler, who were also attorneys for *Frederick* and *Augusta,* made application to the court to be made a party to the action, which application was based upon certain affidavits and a proposed answer and counterclaim in which it was alleged that the deed which he had executed to *Horace* on October 7, 1918, had been procured by fraud and undue influence. A judgment was entered confirming the sale, modifying the order of November 25th determining the rights of the parties in the premises, permitting *Richard* to intervene, and directing that the net proceeds of the sale, amounting to $50,168.25, be divided into five equal parts, one part to be paid each to *Frederick, Horace, Augusta,* and to *Horace* as administrator of the estate of Alfred Bishop, deceased, and the other part to be deposited with the clerk of the court to abide the further determination of the court as to whether *Horace* or *Richard* was entitled thereto. *Horace* replied to the answer or counterclaim of *Richard Bishop,* in which it was alleged that the quitclaim deed of October 7, 1918, was procured by fraud and undue influence, denying the allegations of the answer in such behalf, and affirmatively alleging that on the 22d day of February, 1919, said *Horace* and *Richard Bishop* had fully settled the controversy growing out of the claim on the part of *Richard* that the deed of October 7, 1918, had been procured by fraud and undue influence.

The case went to trial upon the issues thus formed, and from the evidence adduced on this trial it appears that on

the 25th day of January, 1919, Ernest C. Fiedler of Fiedler & Fiedler went to Oxford and interviewed *Richard;* informed him that he was an equal heir with the others in his father's estate; that the interest which he conveyed away by the deed of October 7th was of the value of $12,000. *Richard* claims this was the first time he ever knew that the deed of 1881 had not deprived him of his interest as an heir in his father's estate, although he realized soon after the execution of the deed of October 7th that he was an heir of Alfred and that he had a one-fourth interest in Alfred's estate.    *Richard* authorized Fiedler to commence an action against *Horace* to set aside the deed of October 7th.    Upon his return to Wisconsin Fiedler communicated to *Horace* and his attorneys the fact that he had been employed by *Richard* to commence an action to have the deed set aside. Mr. McGeever, one of the attorneys for *Horace,* went to Oxford, Nebraska, on February 6th in an effort to bring about a settlement of the action which *Richard* proposed to bring against *Horace.*   His visit was unsuccessful.    On the 22d day of February *Horace* himself went to Oxford, Nebraska, called at the home of *Richard's* daughter, where he lived, and spent most of the day in talking a settlement with *Richard,* in the presence of his daughter and her husband. An agreement of settlement was finally reached, by which *Horace* agreed to pay *Richard* $5,600 in addition to the $400 paid for the deed of October 7th, gave him a check for $1,600, his note for $4,000, and *Richard* executed to him another quitclaim deed.    Both parties telegraphed their lawyers that the case was settled.    Upon or before the trial of the case the check and note were tendered to *Horace,* and upon his refusal to accept the same they were delivered to the clerk of the court, to be held by him for the use of *Horace,* and *Richard* repudiated the settlement, claiming that it also was the result of fraud and undue influence.

The trial court found that the deed of October 7, 1918, and the settlement of February 22, 1919, were both pro-

cured by fraud and undue influence and were void and of no effect; that *Richard Bishop,* as heir of James Bishop, deceased, was entitled to his share of the funds of the estate in the hands of the clerk of the court and was likewise entitled to one fourth of the net amount for distribution of the estate of Alfred Bishop, deceased. From the judgment entered pursuant to such findings *Horace Bishop* appealed.

For the appellant there were briefs by *McGeever & McGeever* of Dodgeville, attorneys, and *Miller, Mack & Fairchild* of Milwaukee, of counsel; and the cause was argued orally by *J. G. Hardgrove* of Milwaukee and by *J. D. McGeever* and *W. C. McGeever.*

For the respondents there was a brief by *Fiedler & Fiedler* and *R. T. Jackson,* all of Mineral Point, and oral argument by *Mr. E. C. Fiedler* and *Mr. Jackson.*

OWEN, J. We shall not consider whether the quitclaim deed of October 7th was procured by fraud or undue influence, because we are convinced that the settlement of February 22d must stand, and the fraudulent character of the transaction of October 7th accordingly becomes immaterial.

The findings of the court are replete with recitals of mere evidentiary matters, and it is difficult to understand upon what ultimate fact the trial judge based his conclusion that the settlement of February 22d was obtained by fraudulent representations. If it can be sustained at all, it must be by virtue of the following, quoted from the findings:

"On said day *Horace* falsely and fraudulently misrepresented to the said *Richard* that the latter's share did not amount to $12,000, but amounted only to $10,000; that the litigation would be very expensive and entail heavy costs; that if the case went to the supreme court, depositions or affidavits could not be used there, but that *Richard* and the witnesses would have to appear personally before the supreme court; that the sheriff would have to come from Iowa county to Oxford, Nebraska, to subpœna the witnesses,

Bishop v. Bishop, 171 Wis. 172.

and that after attorney's fees, witness fees, railroad fares, and court costs were paid, *Richard* would not have more than $6,000. *Horace* exhibited a paper with a number of figures on it, and insisted that *Richard's* gross share was only $10,000, when in fact it is $12,000."

The only portion of that recital which can be said to constitute the misrepresentation of an existing material fact is this: *Horace* exhibited a paper with a number of figures on it and insisted that *Richard's* gross share was only $10,000, when in fact it is $12,000. The figures referred to were taken from the order of the court confirming the sale, and it is not disputed that they were correct. But it is difficult to see how this incident could form the basis of a material misrepresentation. It may be conceded that he argued from the figures presented that *Richard's* share is only $10,000, when in fact it is $12,000. But this was only an interpretation of that portion of the court's order, and such interpretation was neither believed nor relied on by *Richard*. When asked if he relied on this representation, *Richard's* answer was "No siree." The talk about court costs and what would ultimately be left did not constitute a misrepresentation of existing facts. It was nothing but "dealers' talk," so to speak, and there is not the slightest reason to believe that it influenced *Richard's* action in making the settlement.

Coming to the question of undue influence, the finding of the court is as follows:

"I find that *Richard* is a man past seventy-eight years of age. He is very deaf. He is in failing health, mentally weak, easily influenced, and incompetent to enter into a transaction of any importance. For many years he has suffered from rheumatism and kidney trouble. He has had a number of fainting spells, and has at times become suddenly dizzy and unconscious. His memory is poor. He is at times unable to recall from day to day recent happenings. He is easily excited, decidedly eccentric, quite nervous, and singularly susceptible to influence. He is a man of practically no education, has had very little business experience, and is not conversant with the ways of the world. *Richard*

has very little property.    He has four children of his own and a stepson, all of whom are in poor circumstances.

"I find that *Horace* is a man sixty-three years old.    He is in good health, and is a shrewd business man.    He owns a farm of 400 acres in Iowa county, Wisconsin, is a director in the Cobb State Bank, and has been engaged in farming and handling stock, and has transacted a great deal of business.    When he was a boy he went to school at different places and for a time attended the Mineral Point high school.    *Horace* impresses me as a man of strong will and a person who is far superior to *Richard* in intelligence, and one disposed to exert undue influence upon *Richard* for the purpose of securing an undue advantage over the latter; and that he did exercise and exert an undue influence over *Richard* in inducing the latter to execute the deed and assignment on October 7th and the so-called settlement paper on February 22d; that *Richard* did not understand or comprehend either transaction."

A consideration of this branch of the case will require a discussion to some extent of the evidence which it is urged justifies the finding, and in this connection it should be said that *Richard* did not appear in court as a witness upon the trial of the action; his evidence, as well as that of the witnesses who testified in his behalf, having been submitted in the form of depositions, so that the trial court did not have the usual advantage over this court in meeting the witnesses face to face.    His impressions as to character, etc., the same as ours, must result from a consideration of the printed word.    At the outset, we have no quarrel with the suggestion that *Horace* was a man disposed to exercise undue influence if by so doing he could further his own interests.    Whether the conduct of *Horace* in procuring the deed of October 7th, by which, for $400, he secured property of the value of from $10,000 to $12,000, can be condemned in law, the motives which prompted him to accept the fruits of that transaction were extremely selfish, and fall far short of the standard set by the Golden Rule or considerations of becoming brotherly conduct.    So far as his

part in that transaction is concerned, whether it can be con-
demned in law, it falls far short of good morals.    But we
are dealing now solely with the transaction of February 22d
and the question of whether *Richard's* acquiescence in the
settlement of that date was the result of undue influence.
While not denying the disposition of *Horace* to exercise un-
due influence for the accomplishment of his purposes, we are
strongly impressed that *Richard* was not susceptible thereto.

When *Horace* first learned that *Richard* contemplated
bringing an action to set aside the deed of October 7th he
sent his attorney, Mr. McGeever, to Oxford for the purpose
of securing a settlement with *Richard*.    This was on Febru-
ary 6th.    Mr. McGeever spent practically an entire day
with *Richard* in discussing the matter.    While Mr. Mc-
Geever no doubt employed nothing but legitimate argument
and honorable means to bring about a settlement, we may
believe that the cause of *Horace* was forcibly and persua-
sively presented to *Richard* and that cogent reasons were
urged upon him for making the settlement which Mr. Mc-
Geever then proposed.    We find that in this interview
*Richard* was abundantly able to take care of himself and his
own interests, and that he was by no means a child or a man
easily handled or influenced.    To each of the propositions
put forward by Mr. McGeever, to quote *Richard's* own testi-
mony, the reply was, "Nothing doing."    McGeever having
failed to arrive at an understanding with *Richard, Horace*
himself went there on the 22d day of February, 1919.    At
no time was *Horace* alone with *Richard*.    The matter was
discussed in the house in the presence of *Richard's* daughter
and her husband, and the testimony is that *Richard* con-
ducted the discussion in his own behalf.    He says he was
half sick and half mad.    This is a very natural temper for
a brother to be in under the circumstances.    *Horace* pro-
duced the figures that he had taken from the court's order,
and from them attempted to convince *Richard* that his inter-
est was only $10,000.    Now *Richard* had never seen these

figures before and knew nothing about them, but he was sufficiently intelligent and awake to point out to *Horace* that according to those figures his share was $12,000, and his own testimony is to the effect that he neither believed nor relied upon what *Horace* said in this particular.  They talked for the greater part of a day, and *Richard* remained immovable.  *Horace* made no impression upon him, and, feeling that further discussion was useless, he started to go. Then it was that the daughter of *Richard* spoke to her father and said: "He is going to go.  Now you better make up your mind."  From this circumstance it is quite evident that the daughter felt that he ought to make a settlement, but *Horace* was about to go, and she was solicitous lest he should leave and the opportunity to settle go with him. She had been a listener to the entire discussion.  She had neither taken part in it nor coached her father.  Neither had her husband.  They no doubt had an interest in *Richard* and an interest in the controversy, yet they felt he was entirely competent to cope with the situation and did not intrude.  He yielded neither to the arguments, persuasion, or influence of *Horace*, but stood firmly until *Horace* was about to go, when, at the suggestion of his daughter, he said to *Horace:* "Now what is your best proposition?" *Horace* said: "You have already had $400.  I will give you $5,600 more, making $6,000 in all," and *Richard* promptly said, "I will take you up."

Now this is the sum and substance of what occurred, according to the testimony of *Richard,* his daughter, and her husband, and from it we find no basis for a conclusion, which must rest upon clear and satisfactory evidence, that *Richard* was induced to make the settlement because of undue influence exercised upon him by *Horace*.  A perusal of his deposition does not picture him as a weak and childlike man.  On the contrary, it gives the impression of intelligence and self-reliance.  He shows a ready and unusual understanding of the questions asked.  His answers are

prompt, terse, and straight to the point, and at times give evidence of most remarkable memory, especially as to details.	His own testimony is:

"I was in sound mind on February 22d and I understood what this Exhibit B was [the release]; I knew what it was that I was signing; I did it of my own free will. *Horace* did not threaten me if I did not sign this; he did not force me to sign it; he did not deceive me into signing this on February 22d. My decision to accept $5,600 came after a conversation with my daughter."

What is this if not a deliberate assertion of his competency and a denial of any unfair dealing on the part of *Horace?* His daughter said:

"He seemed to be relieved after this signing; he said he was glad it was settled, although he did not consider it just. I consider that sometimes father may be competent to transact business involving an amount of $10,000 or $12,000, but I do not know whether he was competent to transact such business on the 7th day of October. I would not testify that he was not. On the 22d day of February he seemed to be competent to transact such business. By saying not competent at all times I mean that there are times when he is absent-minded and not feeling well, don't seem to really realize everything as he should; but he was not in that condition on either the 7th day of October, 1918, or the 22d day of February, 1919, that I know of."

The findings of the court with reference to his physical infirmities bear little relation to his mental competency or his power to withstand influence. The same or similar findings could be made with reference to the average man of seventy-eight years of age, and it seems to us that they should be accorded very little significance in determining the question of his susceptibility to influence.

More than this, we are impelled to say that, in our opinion, the terms of settlement raise no suspicion of undue influence. We are impressed that *Richard* made a settlement that was satisfactory to him and that his bargain was not a bad one. On the day after Mr. McGeever returned

from Oxford, Mrs. Burton, the daughter of *Richard,* with whom he was living, wrote to her Uncle *Horace,* referring to the visit of his attorney the day before, in which she said: "Father says for me to tell you that if you will send $4,600 to the Security State Bank at Oxford for him he will settle. You are to pay all expenses also." Here we have a well-considered proposition coming from *Richard* following a discussion with Mr. McGeever, after opportunity for reflection and consideration. Certainly that offer was not the subject of misrepresentation or undue influence. When *Horace* came out to see him the matter was argued fully. He met argument with argument. He stood his ground to the last, and when *Horace* had despaired of arriving at a settlement and was about to go *Richard* called for his best offer, and, upon receiving it, promptly accepted. We must remember that it was not a gilt-edged promissory note or a government bond of the value of $12,000 that he was compromising for $6,000. He had given a deed which he was seeking to impeach for fraud and undue influence; that he would succeed was certainly a matter of some doubt. He knew the facts and circumstances surrounding the execution of the deed better than any one else. He was in a position to bring rugged common sense to bear upon the facts as he knew them and to arrive at an intelligent layman's conclusion in the premises. He might well have preferred the $6,000 in cash to the uncertain prospects of a $12,000 lawsuit, the fruits of which he might not live to enjoy. He was a man seventy-eight years of age. A stubborn legal contest stood between him and recovery. He lived many hundred miles from the place of trial. There would be months of worry and anxiety. He was at law with his brother. Conceding that he felt the justice of the cause, we but recognize the ordinary instincts of human nature when we attribute to him a desire to have the matter settled and over with. His daughter said: "He seemed to be relieved after this signing; he said he was glad it was

settled, although he did not consider it just." · Who can say that it is not a settlement that would have been made by a man of the strongest faculties, in view of the circumstances which then confronted *Richard?* That it is an unreasonable settlement is not obvious to our minds.

It is claimed that the settlement is void because it was made in the absence of *Richard's* attorneys. *Watkins v. Brant,* 46 Wis. 419, 1 N. W. 82; *Bussian v. M., L. S. & W. R. Co.* 56 Wis. 325, 14 N. W. 452; *Voell v. Kelly,* 64 Wis. 504, 25 N. W. 536; and *Konrad v. Zimmermann,* 79 Wis. 306, 48 N. W. 368, are cited to sustain the proposition. These cases do not go to the extent of impeaching a settlement made between brothers, where the transaction is as free from the taint of unfair dealing as here. The law favors amicable adjustments of controversies, and family disagreements constitute no exception to· the rule. All society deplores family quarrels. Amicable adjustments, reconciliations, and restorations of family ties should be sincerely encouraged. Courts should endeavor to preserve rather than seek to destroy the fruits of brotherly conference and adjustment.

To impeach this settlement requires clear and satisfactory proof of unfair dealing. The evidence falls far short of this quantum. We feel satisfied that the findings of the trial court are against the preponderance of the evidence. *Richard* should be denied the relief prayed for, and the rights of the parties should be left as determined in the order of November 25, 1918.

*By the Court.*—Judgment reversed, and cause remanded with instructions to enter judgment in accordance with this opinion.

SIEBECKER, J., dissents.