In re ESTATE OF THURMAN DAYTON, deceased.

No. 48704.

(Reported in 71 N.W.2d 429)

1210

July 27, 1955.

McCarville & Bennett, of Fort Dodge, for appellant, Myrt Dayton.

Arthur H. Johnson, of Fort Dodge, for administratrix.

Loth & Melton and J. B. Cross, all of Fort Dodge, for Velda Hotek et al., appellees.

SMITH, J.—Thurman Dayton (51), leaving neither widow nor issue, died September 19, 1952, survived by a sister, Susan Brower, a brother, Myrt Dayton (appellant) and Velda Hotek et al. (appellees), the six children of a deceased brother, Hiram L. Dayton. All were of full age.

On September 24, 1952, Myrt had Susan appointed administratrix and signed her bond as such. October 17, Velda filed an instrument for probate, in form a carbon copy of a will, but bearing the *original* signatures of decedent and the attesting witnesses.

On October 29, 1952, Velda Hotek and Myrt Dayton, by attorney, filed a *"petition for establishment and probate of lost*

*will"*, to which was attached a copy of the document above described—possibly another carbon copy of the same original. It is not clear whether this later petition was or was not intended as an abandonment of the earlier attempt to probate the instrument itself as an original will. In either case the result was a will contest.

The offered document purported to cut Susan and Myrt off with one dollar each and to give decedent's brother Hiram L. Dayton the entire estate. It nominated the latter executor without bond.

Susan resisted probate of the instrument, alleging it purported to be only a copy and that, if ever executed, the will had been revoked by decedent. There was no claim its execution was due to incompetency or undue influence.

The attorney who drew the proffered instrument being called as witness for Myrt Dayton, objector in the present litigation, testified that, pursuant to his custom in such matters, he "prepared three exact wills, triplicates, one exactly like the other, and each signed and witnessed and executed the same as the others." He retained one of the carbon copies and says "I considered this an original." He thinks he delivered at least one of the others to decedent. A merciful court spared him the embarrassment of a thorough cross-examination as to his theory in pursuing this unusual procedure and as to the legal complications it might engender. We are also spared the duty of passing on the legality or effect of the resulting documents.

The administratrix (May 12, 1953) inventoried: The South Half of a certain Lot 8 in an Addition to Fort Dodge, estimated value $4000; cash and bank balance, $364.49; Postal Savings certificates, $2420; and U. S. Savings "E" bonds as follows: 5 running to decedent, $1435; 6 running to decedent "or" Susan Brower, $954.50; 10 payable to Susan "or" decedent, $6640; and 4 payable to "Susan Brower, P O D Thurman Dayton", $1328.

Household goods were listed $100, and an undivided one-third interest in a contract to sell certain lots to one Gibson, $4069.24. Estimated debts were reported as $1000 and "value of entire estate $21,288.73."

The Gibson contract, after a payment on same of $529.17, received March 1, 1953, was sold under order of court August 3, 1953, to Susan Brower and Myrt Dayton for $3659.48.

On October 30, 1953, the administratrix submitted her final report in which she proposed distribution of the estate according to a plan to which she alleged "all persons interested in the estate" had agreed "in order to completely compromise and settle the litigation over the instrument offered for probate, and other controversies involving decedent's property and its distribution."

The last reference was doubtless to disagreement over the real ownership of bonds payable alternatively to decedent *or* his sister; also, presumably, to Mrs. Brower's claim (never actually filed) in the sum of $3000 for taking care of decedent, looking after and waiting on him, doing "everything for him."

Velda and her group, on October 31, 1953, joined in the final report, alleging that in August 1953 they agreed "to the compromise and settlement outlined" therein and "that Susan Brower and Myrt Dayton both agreed thereto;" that all parties had signed deeds "to be used in carrying it out, and that the deeds were so used."

Myrt Dayton, who had originally petitioned for his sister's appointment as administratrix, and who later joined Velda in petitioning for the establishment of a lost will, promptly (November 2, 1953) filed objections to the final report. They were overruled and he has appealed.

His objections urged that the proposed distribution "is unfair, unjust, unreasonable, not in compliance with the agreement" and that he had not had the benefit of independent legal advice but had "been induced by fraud and mistake to enter into the agreement which deprives him of his honest and reasonable share." Other matters are alleged but this seems fairly to constitute his real contention.

After payment of inheritance taxes the compromise, as embodied in the final report, gave Susan $7746.72. Myrt was to receive one third and the Hiram Dayton heirs two thirds of what remained. The actual net amounts received respectively vary somewhat from this ratio because of varying degrees of rela-

tionship to decedent causing variance in rate of inheritance tax. The bonds were all treated as part of the estate. After payment of inheritance taxes Myrt would receive $3569.66, Hiram's heirs, $6829.91.

Before discussing the issues it may be helpful to review briefly the conflicting interests of the parties throughout the negotiations of settlement.

I. First, there was the unusual problem of decedent's testacy or intestacy, presented by his execution of identical, concurrent triplicate wills, one of which (possibly the typewritten original in his custody) he may have destroyed; second, the problems of Susan's $3000 claim for services and the question of the real ownership of nearly $10,000 of bonds, alternatively payable to her; and third, the division between Myrt and the Hiram Dayton heirs, in case of settlement without trial of the other matters above enumerated. We shall discuss this third matter in a later division in its relation to the present appeal.

 Unquestionably there was a situation ripe for a family settlement if the estate were not to be exhausted or seriously depleted by litigation. And certainly such settlements, if fairly entered into, are favored by the law. Adams v. Adams, 70 Iowa 253, 257, 258, 30 N.W. 795; Watrous v. Watrous, 180 Iowa 884, 906, 163 N.W. 439; 15 C. J. S., Compromise and Settlement, section 3b; 11 Am. Jur., Compromise and Settlement, section 11.

II. The authority given the attorneys of Myrt and Velda to negotiate the settlement was reduced to a writing dated July 27, 1953, signed by Myrt and by Velda ("for myself and my brothers and sisters") and addressed to their attorneys J. B. Cross and Loth & Melton. It purported to authorize the attorneys "to negotiate and complete a settlement with Mrs. Susan Brower of all the disputes and litigation involving the bonds * * * and over his will and its probate, and all other controversies in or concerning his estate * * * as follows:"

There followed four numbered paragraphs which we need only briefly summarize. Mrs. Brower was to receive "approximately (and not any large sum above) $8000", plus her statutory fee as administratrix, in full of everything including her claims to Government bonds. The property left, after payment

from it of statutory attorney fees and all claims and expenses of administration "except state inheritance taxes (which each party will pay as to himself)" was to be divided *one third to Mr. Myrt Dayton and two thirds to the children of Hiram Dayton.*" Ample power was given the attorneys to negotiate and consummate the settlement and there was an agreement "to sign and execute any documents or releases which may be needed for or be appropriate to carry it out."

The compromise settlement of Mrs. Brower's share in the estate, as reflected in her final report, is believed to be in substantial compliance with the above-described authorization. Objector urged no complaint as to it.

III. His complaint concerns the division between himself and Velda's group of what remained after the settlement with Susan. He claims he understood he was to receive (and that he should in fairness receive) *one half* of this remainder, instead of the *one third* allowed him.

His "Errors relied on for reversal" are stated in terms too general to provide any clear basis of classification for consideration. The five "Questions presented by this appeal" which he also sets out in his brief may be reduced to two contentions, viz.: (1) That there was no good faith controversy as to decedent's intestacy, sufficient to support a "family settlement"; and (2) appellant's signature to the authorization under which his attorneys acted in negotiating the settlement was obtained by fraud, principally by reason of the fact that the same attorneys represented both him and Velda's group, and therefore he did not have independent legal representation.

Though we have already (in Division I) expressed our opinion as to No. (1), some elaboration may be proper as to the part played by the pending will contest. We think its good faith cannot be successfully questioned nor its substantial part in the negotiations disregarded. Objector, in a motion for new trial, complained in the lower court that the court "fails to determine the issue * * * as to whether or not Thurman Dayton died testate or intestate." The same complaint is implicit in his argument here.

1216

The answer is of course that the merits of the will contest are not and were not in issue. Did it or did it not present a real, good faith, substantial controversy? That was the issue. It is true Susan Brower testified: "He [Thurman] had made a will. He told me it had been destroyed." Though no objection was urged under the "dead man's statute" it may be safely assumed that objection would be urged to such testimony in any will contest. It is also true another witness testified: "I was given to understand that Mr. Dayton had * * * made numerous wills. That he had subsequently destroyed every one * * *." This also was unobjected to, but it could not have escaped so easily had the question at issue been the admission of the instrument to probate.

The trial was at law. The question of possible revocation was certainly one of fact and could not be tried de novo here. In re Estate of Sheeler, 226 Iowa 650, 658, 284 N.W. 799. Nor could the legal question created by the execution of triplicate wills be here finally determined. These could only be appraised as to their sufficiency as basis for compromise. The good faith assertion of an unfounded claim furnishes ample consideration for a settlement. First Nat. Bank v. Browne, 199 Iowa 981, 203 N.W. 277; Messer v. Washington Nat. Ins. Co., 233 Iowa 1372, 1380, 11 N.W.2d 727, citing 15 C. J. S. 728, 730, section 11. See also 15 C. J. S., Compromise and Settlement, section 37.

Furthermore, appellant erroneously assumes "the estate was probated as an intestate estate" and that he was "entitled to take under the statute of descent and distribution." This assumption completely ignores that the question of testacy or intestacy (as well as Susan's claims) was being *settled*, not *adjudicated*. The purpose of the negotiations was to eliminate "all other controversies in or concerning" the estate. This included an agreement on a basis of distribution in lieu of the provisions of the contested will but not necessarily under the statute.

The objector was a party to the tender of the "duplicate original will" for probate, in order to combat his sister's claims. On July 27, 1953, he signed the express written authorization to his then attorneys to settle (among other controversies)

the will contest he had helped inaugurate. He is not now in position to question the good faith of such contest.

Nor may he here have any pronouncement upon the merits of the several controversies purported to be settled as stated in the final report. Such merits are not in issue.

IV. We come at last to the real gist of objector's complaint both in the trial court and here. He contends that his attorneys violated their obligations to him by acting at the same time as attorneys for Velda et al.; that he did not therefore have the benefit of independent legal advice; and that he was "persuaded and coerced to sign" the written authorization above referred to.

It is difficult to say what were Myrt's real "interests" which his attorneys were expected to safeguard. He was originally instrumental in having his sister appointed and qualified as administratrix. That matter was apparently handled by Attorney Johnson who became attorney for the administratrix. It appears objector soon learned his sister proposed to make some claim for services alleged to have been rendered decedent. Mr. Johnson testified there was some dispute between the brother and sister over that matter, the former advising his sister in effect "that she wasn't to have anything." This is undenied in the record. It may explain his later devious course.

Objector next appears represented by Mr. Cross who had drawn the instrument tendered for probate and who represented him and Velda in proposing probate of the claimed will. He must have known such probate would conflict with his *financial* interest, but apparently he had other motives.

 The mere possibility of a later conflict arising between clients does not disqualify an attorney from representing both. Lessing v. Gibbons, 6 Cal. App.2d 598, 45 P.2d 258, 261. Myrt and Velda were making common cause against Susan. The attorneys they employed were not required to anticipate future conflict of interest between them.

Attorney Cross testified: "Mr. Dayton indicated that he would rather see the will probated than see Mrs. Brower get it." Mr. Loth said: "Their interests were not adverse. I was told Mr. Dayton was so mad at his sister he would rather see the will probated and not get anything."

1218

Authorities factually in point are not plentiful. In Busey v. Perkins, 168 Md. 19, 25, 176 A. 474, 477, it was held "a solicitor may represent two clients who desire the same result, although their interests vary in degree", citing Mechem on Agency (2d Ed.), sections 2188, 2192–2195. See also Hopkins v. National Bank, 115 Okla. 196, 242 P. 532; 5 Am. Jur., Attorneys at Law, section 65; 7 C. J. S., Attorney and Client, section 47, pages 826, 827.

Objector must have understood, when the will contest developed and negotiations of settlement commenced, that the Hiram Dayton heirs and his sister, Susan, were in better bargaining position than he. They each had apparent advantage they could if necessary relinquish. Susan had her claim for services and the bonds, Velda et al., the potential will. Myrt had only his right to share equally with the others in case of intestacy and subject to Susan's claims.

Before Attorney Loth came into the picture the parties had been negotiating as to Susan's claims. That was in November 1952, and perhaps earlier. Attorney Cross did not participate in those negotiations. Attorney Johnson testified "I was representing the interests of everybody at that time." Nothing was agreed on and on December 1 Myrt left for California to be gone until July. He and Velda's brothers and sisters had already given her a general power of attorney "to collect and receipt for and settle and deal with their interests in the Thurman Dayton Estate." She, at Mr. Cross's suggestion, authorized the employment of Attorney Loth.

Myrt came back from California the first Monday in July, 1953. Of course the question of Susan's claims was important whatever became of the will contest. Mr. Johnson testified "as far as I can remember there was no discussion about the division between the Hiram Dayton heirs and Myrt Dayton."

But there was evidence of such discussion. Johnson was not a necessary party to it. Velda testified there had been negotiations soon after Thurman died: "He [Myrt] was not to have the same amount as we got; he would have one third after Aunt Sue had taken out what she required for her share * * *. I wasn't there, my brother Orville talked to them, but that is what I un-

derstood the agreement was." Orville was not called as a witness.

Velda further testified: "Myrt and I both went to Mr. Cross because we felt we should have a lawyer; we were trying to get as much of the bonds as we could. We were friendly. I thought we were helping each other." Mr. Cross recommended the employment of Loth. Velda says "I thought Uncle Myrt was agreeing to a one-third share in our estate."

The attorneys reasonably assumed the existence of an amicable arrangement between Myrt and Velda. As pointed out by Mr. Johnson, the necessity of knowing what that arrangement was only arose "when the time came to pay the Iowa Inheritance Tax which Mrs. Brower, as administratrix, had to pay. * * * It would be the last week in July or the first week of August, 1953, as I recall."

Just before this time (July 20) Mr. Loth wrote the attorney for the estate after referring to the problem of the inheritance tax and the proposed settlement with Susan: "I do not know if my people will go for this. I feel strongly that the rights of the devisees" (the Hiram Dayton heirs) "are worth much more than what will be left for them; and, unless Myrt will discount his share substantially in their favor, I don't see how I can advise them to give your client so much."

Then came the meeting in Mr. Loth's office (July 25) when the details of the contemplated settlement were discussed and the authorization to the attorneys to negotiate it was formulated (not written and signed however until July 27 because no stenographer was available). Myrt, Velda, Cross and Loth were all present.

Concerning this meeting the record is in some confusion but at least all present except Myrt say there was no controversy over the division of what would be left after settlement with Susan. Velda testified: "Uncle Myrt figured it out with pencil and paper. * * * He asked Mr. Loth for those figures * * * and figured up and he said that would be all right. Mr. Loth said he would have the papers drawn, and Uncle Myrt signed * * * at a later date."

According to Mr. Cross they discussed whether the will could be probated and the possibilities pro and con. "They had

not made up their minds." He also testified Myrt and Velda "seemed to get along all right. They made this agreement on their own accord. No, I didn't think there was a discrepancy (sic) in their interests."

The witness also said: "Mrs. Hotek talked about taking what was left after Aunt Susan was paid, with one third to Myrt. It was finally decided and Mr. Dayton said we should try to go ahead with this settlement."

Mr. Loth testified: "I was with Mr. Dayton three times. One was when he came in alone after he got back from California; one was when he and Mr. Cross and Mrs. Hotek were there; and one was two days later when he signed Exhibit F" (the written authorization) "and those are the only times I have ever spoken or written to Mr. Dayton. * * * The first time * * * almost all the conversation was about the bonds, the status of the bonds. * * * After I * * * told him that there was no chance to get the bonds into the estate on any evidence he had, and I had found that his evidence was all that we would have, I suggested * * * it might be wise to see if Mr. Johnson would reopen the question of * * * a settlement of this estate where we could get the bonds considered as part of it." That was the occasion for Loth's letter to Johnson already referred to.

Mr. Loth's whole answer to the claim that there was angry discussion and argument, even "coercion" inducing appellant to join in the July 27 authorization (Exhibit F), may be summed up in this one sentence: "I never knew Mr. Dayton was dissatisfied or had any qualms about Exhibit F until you" (appellant's present attorney) "called me or phoned on the 3rd day of October." His version of what transpired when the proposed authorization was agreed on does not differ essentially from the accounts of Velda and Mr. Cross.

And from his testimony it develops that appellant was actually present two days later when Exhibit F was dictated, written, and (by appellant) signed:

"Mr. Dayton came back first on Monday. He came back before this was dictated, and I called the girl in and dictated it to her in his presence. While I was dictating it he listened. He

made no objections. After she went out and was typing it he said something to the effect that he wasn't sure whether he wanted to do this or not and didn't I think that Mrs. Hotek would do better than to give him one-third, and I said, 'I don't think she will, because you heard what she said, herself, here last Saturday, but if you want to * * * find out whether she has changed her mind, go ahead.'

"Well, he talked a while * * * (and) guessed he wouldn't go talk to her. I finally said to him, 'Mr. Dayton, you don't have to sign this. It is entirely all right with me whether you sign it or not, but if you don't sign it, I can't go to Mr. Johnson and make a settlement. If you don't sign it I don't see how I, as a lawyer, can represent you afterwards because this settlement would give you the most money. If every phase of the litigation is decided favorably to you, you won't get this much, and I don't see why I should be interested in representing you if you won't take what is the most you can get anyway.' * * *

"Finally he said, 'Well, I don't know why I shouldn't sign it and go ahead and get it over with' and he did."

█ The mere fact that a party enters into a compromise contract reluctantly does not constitute duress. 15 C. J. S., Compromise and Settlement, section 33a; Du Puy v. United States, 35 F.2d 990, 1003, 68 Ct. Cl. 574.

█ We must conclude the charges of fraud and coercion and mistake cannot be sustained under this record. Appellant's final change of position came after the settlement with Mrs. Brower was consummated beyond the time within which any fair rescission by him could be allowed.

█ The witnesses were all called by the objector. The trial judge heard and saw them and his factual findings are abundantly supported by the record. We think he could not well have reached any other result. To impeach a family settlement requires clear and satisfactory proof of unfair dealing. Bishop v. Bishop, 171 Wis. 172, 176 N.W. 776, 780; 11 Am. Jur., Compromise and Settlement, section 29, page 277, note 14. The court's comment relative to the objector's failure "to restore anything that he has received or to put matters in statu quo" was

perhaps not exactly apropos to the factual situation but it was not necessary to the decision.

V. Our extensive reference to and quotations from the testimony are justified, in view of the question of professional conduct charged in the objections. The record is not readily condensable. Our primary duty to the litigants is not our only concern. If there has been a breach of professional ethics it is our duty promptly to rebuke it whether it has or has not injured the actual parties. The court, as well as the counsel, must uphold the integrity of our common profession and be vigilant in preserving its honor, against either violation by wrongful conduct of the attorney or wrongful attack from without.

Sensitive to this situation we have set out the record with greater fullness than we might otherwise have done, and possibly we have studied it with even greater care than would have been adequate to a just determination as to the rights of the parties themselves.

The charges are serious and we owe to both the counsel here and to the profession generally an expression of our reaction.

Counsel for appellees had a faint intimation at a critical hour in the negotiations that there was a possible conflict of interest between his clients, when objector hesitated to sign the authorization. But the moment passed, Myrt signed the document and made no further objection until the settlement had been made and partially acted on. He made it then through another attorney.

We have studied closely the conflicting testimony as to what transpired in Attorney Loth's office on July 25 and 27, in the light of all that had preceded. Based on that study we have no hesitancy in affirming the conclusion of the trial court and it is so ordered.—Affirmed.

All JUSTICES concur.