OF THE

## STATE OF IOWA

AT

DES MOINES, JANUARY AND MAY TERMS, 1909.

AND IN THE SIXTY-THIRD YEAR OF THE STATE.

CALLENDAR SAVINGS BANK, Appellee, v. B. F. Loos, Appellant.

|142 1|
|142 399|

Bills and notes: DURESS AS A DEFENSE: EVIDENCE: DIRECTION OF VERDICT. There may be a duress of property as well as of the person which is provable in defense of a contract induced thereby, and while defendant has the burden on this issue he is not required to show a manifestation or apprehension of physical violence. In the instant case the evidence of duress in defense of a suit on a promissory note is held sufficient to take the issue to the jury; and it is also held that the court erred in summarily directing a verdict for plaintiff at the close of defendant's testimony, and without giving him an opportunity to offer additional evidence in corroboration of his own, on the theory that defendant had failed to show any manifestation of physical violence.

VOL. 142 IA.—I

*Appeal from Polk District Court.*—HON. W. H. Mc-
HENRY, Judge.

THURSDAY, MARCH 18, 1909.

ACTION at law upon a promissory note for the sum of
$1,000, made and executed by defendant to one Frank O.
Peterson and by him indorsed in blank. Plaintiff claims
to be the owner, and asks judgment for the face thereof,
with interest. Defendant denied the allegations of the peti-
tion, and pleaded that the note was obtained from him by
Peterson through force, fraud and extortion, and is and was
without consideration. The case was tried to a jury, re-
sulting in a directed verdict for plaintiff, and defendant ap-
peals.—*Reversed.*

*B. F. Loos, pro se.*

No appearance for appellee.

DEEMER, J.—After the jury was impaneled, plaintiff
introduced its note in evidence and rested. Thereupon de-
fendant was placed upon the stand and gave the following
testimony bearing upon the issue of duress:

I was acquainted with F. O. Peterson. At that time
he resided in Oak Park, in this city. I had known him
eight or ten years before that. I had some business trans-
actions with him before May 22, 1903. We were organiz-
ing this German Mutual Insurance Company. Mr. Peter-
son used to live neighbor to me. Mr. Peterson met me on
the street and told me he had just sold some coal land, and
had several thousand dollars in the bank. I told him we
were organizing this German Mutual Insurance Company,
and I asked him whether he wanted to invest in it, and he
came up to the office, and I told him about the company and
how I got it. He wanted to think it over. We figured a
week or two. He studied it all over, and he came down and

agreed to give me $1,000, and I gave him an agreement that when the company was organized, and we had issued guarantee fund stock, I would give him a $1,000 certificate of this stock in the company, and I signed that agreement as president of the German Mutual Insurance Company. I had been elected in Council Bluffs. He gave me the $1,000, and I gave the company's agreement, when it was organized, we would give him $1,000 in guarantee fund stock for the money. I did not borrow this money personally. It was to promote this company. · The German Mutual Insurance Company was formerly at Council Bluffs. Before I went down and bought it, I talked with the Auditor of State, and he told me to go down and buy it. I got permission to buy it, and I carried it along as near legally as I could. I was president of it. It was not fully organized. We were organizing. We had to get $5,000 in cash and $20,000 in notes before we could get a charter, and that is what we were working for. The $1,000 was not borrowed. It was given to me to promote the company, with the promise of the company to give stock back. I signed that instrument. I do not know where it is. Mr. Peterson got it. I delivered it to him at the time I received the money. The instrument will show for itself. I do not remember the date. I could look up the date. It was several months before May 22, 1903. It run along, and we were about ready· to incorporate, and Mr. Patton that lives up neighbor to Mr. Peterson, his attorney here, he got in with Mr. Peterson, and the first I knew one day here comes Mr. Peterson with the constable, Charlie Kingman, and Mr. Patton. Well, I knew what a new insurance company is just about the time you are about to get a charter, if you start any legal proceedings. Mr. Patton called me to one side, and Patton told me I had to give security for that money. I did not give security to start with. I just gave the agreement, when the company was organized, I would give him stock, and Patton brought the constable and had papers read and served on me. He threatened to tie everything up, and he was going to start criminal proceedings, and that he would have me arrested, and unless I did secure it there would be criminal prosecution. I do not know what kind of papers he had. The constable had the papers and showed them to me. I think Mr. Kingman may have them yet. He said I

was *to either give this security or he would serve the papers on me. It was on account of these acts of Peterson and Patton and the constable that I executed this note in question. It was fixed up that day right there. Mr. Patton kept the constable right there, and himself, and we fixed it up. I gave him a second mortgage on a piece of property out in Clifton Heights as security.

As to the plaintiff's knowledge regarding the methods whereby the note was obtained, defendant testified as follows:

I know Mr. Fitz, the president of the Callendar Savings Bank. The note was dated May 22, 1903, and he came in possession of the note that day—the same day. The note was given into the possession of Mr. Fitz, the president of the bank, the same day it was made. I was there when it was turned over to Mr. Fitz. I had a conversation with Mr. Fitz. He knew all about the deal. I told him. Mr. Fitz knew how this instrument had been obtained in reference to the consideration and manner. I told him all about the circumstances. That was before he came into possession of it or got title to it. Mr. Fitz was president of the Callendar Savings Bank.

At the conclusion of the evidence the trial court asked defendant's counsel as to whether the testimony amounted to duress, and in response thereto the attorney answered "that he thought it did." Asked for authorities upon the subject, he said "he had some at his office, and that there were some fine points in the matter." In response to this the court said, in part:

I think they were fine. They are clear out of sight. . . . I must confess that to my mind the duress is not in view. No, sir; right on the face of the transaction there is no duress. A man comes to me and says you have defrauded me, you got $1,000 of my money, and I am going to have you arrested if you don't secure it. The fact remains I have got $1,000 of his money I am liable for,

and in order to quiet the disturbance and not have any disturbance I gave him the note to secure it. If there is any duress in that, it is so fine I can't see it. The common illustration of duress is, if you put a revolver in a man's face, and say 'Sign that note or I will blow your head off,' and he signs it, that is duress; but when a man makes a claim against you which you say you don't owe, and in order to have harmony you sign a note and give him security for it, there is no duress in that. Every man has a right to sue any other man he wants to to assert his legal claims and have that passed on by the jury, and so had Patton and Peterson, and the fact that defendant conceded it and gave them what they asked for is not duress at all. It would be a very great waste of time, if that is all there is in that case, to go any further with it, because I will tell the jury that is not duress if we ever get to it. The motion to strike will be sustained on the ground the facts detailed by the witness Loos do not amount to duress.

To all of which defendant Loos at the time duly excepted. Plaintiff's attorney then moved the court to return a verdict for plaintiff, and this motion was sustained, and a verdict was directed accordingly. Thereafter, and in due time, defendant made a motion for a new trial, based upon several grounds, among which was the following: That defendant had other witnesses and other material evidence which he was not given a chance to introduce. This motion was promptly overruled, and judgment was ordered upon the verdict. The appeal brings up two propositions: First, the sufficiency of the testimony to take the question of duress to the jury, and, second, the peremptory manner in which the case was disposed of without giving defendant an opportunity to present all of his testimony.

The summary disposition made of the case by the trial court can only be sustained upon the theory that defendant's own testimony did not justify a submission of the question of duress to the jury. He might have supplied other matters by additional testimony, and we are inclined to the view that he should have been permitted to strengthen

his own testimony by producing the testimony of the constable, who he says was present at the time the note was procured from him. The remarks of the trial court indicate, however, that he entertained a new view of the law relating to the subject of duress. Of course, the hypothetical case stated by the trial court would not suggest duress; but surely it is not necessary that one present a revolver and declare, "Sign that note or I will blow your head off," in order to hold him guilty of duress in law. We have gotten far beyond that notion. Under modern notions there may be duress of goods or duress of the person, and in neither case is a display of firearms necessary to the establishment of the charge.

The rule as generally understood in this country is well set forth in the following quotation from *Joannin v. Ogilvie,* 49 Minn. 564 (52 N. W. 217, 16 L. R. A. 376, 32 Am. St. Rep. 581):

At common law 'duress' meant only duress of the person, and nothing short of such duress, amounting to a reasonable apprehension of imminent danger to life, limb, or liberty, was sufficient to avoid a contract, or to enable a party to recover back money paid; but courts· of equity would unhesitatingly set aside contracts whenever there was imposition or oppression, or whenever the extreme necessity of. the party was such as to overcome his free agency. The courts of law, however, gradually extended the doctrine so as to recognize duress of property as a sort of moral duress, which might, equally with duress of the person, constitute a defense to a contract induced thereby, or entitle a party to recover back money paid under its influence. And the modern authorities generally hold that such pressure or constraint as compels a man to go against his will, and virtually takes away his free agency, and destroys the power of refusing to comply with the unlawful demand of another, will constitute duress, irrespective of the manifestation or apprehension of physical force. The rule is that money paid voluntarily, with full knowledge of the facts, can not be recovered back. If a man chooses to give away his money, or to·take his chances whether he is giving it away

or not, he can not afterwards change his mind; but it is open to him to show that he supposed the facts to be otherwise, or that he really had no choice.   Poll. Cont. 556. In *Fargusson v. Winslow,* 34 Minn. 384 (25 N. W. 942) this court held that 'when one in order to recover possession of his personal property from another, who unjustly detains it, is compelled to pay money which is demanded as a condition of delivery, such payment, when made under protest, is deemed to have been made compulsorily or under duress, and may be recovered back, at least when such detention is attended with circumstances of hardship or of serious inconvenience to the owner.'

In *Kennedy v. Roberts,* 105 Iowa, 528, we approved of the following instruction:

The fourth instruction was as follows:   'Duress in the making of a contract exists when the person making it is induced to make it by reason of being put in fear by means of threats of arresting him and unlawfully charging him with crime, when the threats and the fear induced thereby are such as would influence a man of reasonable courage and prudence, and do deprive the party making the contract of the exercise of free will in making it.   The threatened arrest, however, must be wrongful and unlawful, and apparently about to be enforced.'

See, also, *King v. Williams,* 65 Iowa, 167.

Probably the best statement of the modern doctrine of duress is to be found in the opinion of Marshall, J., in *Galusha v. Sherman,* 105 Wis. 263 (81 N. W. 495, 47 L. R. A., 424):

From the foregoing it will be seen that the true doctrine of duress, at the present day, both in this country and England, is that a contract obtained by so oppressing a person by threats regarding his personal safety or liberty, or that of his property, or of a member of his family, as to deprive him of the free exercise of his will and prevent the meeting of minds necessary to a valid contract, may be avoided on the ground of duress, whether the oppression causing the incompetence to contract be produced by what

was deemed duress formerly, and relievable at law as such, or wrongful compulsion, remediable by an appeal to a court of equity. The law no longer allows a person to enjoy, without disturbance, the fruits of his iniquity, because his victim was not a person of ordinary courage, and no longer gauges the acts that shall be held legally sufficient to produce duress by any arbitrary standard, but holds him who, by putting another in fear, shall have produced in him a state of mental incompetency to contract, and then takes advantage of such condition, no matter by what means such fear be caused, liable at the option of such other to make restitution to him of everything of value thereby taken from him.

Following the rules thus announced, which are well fortified by authority, it is manifest that the trial court was in error in striking defendant's evidence and in directing the verdict. Of course, it was incumbent on defendant to show that plaintiff was not an innocent purchaser of the note (*Veach v. Thompson,* 15 Iowa, 380), but there was enough testimony here to take the case to a jury. The summary disposition made of the case by the trial court can not be commended. It was defendant's privilege to corroborate his testimony by that of other witnesses, if he had any, and opportunity should have been given him to do so, instead of peremptorily and hastily dismissing the case.

The judgment must be. and it is. *reversed.*