WILLIAM GUTTENFELDER, Appellant, v. GEORGE IEBSEN et al., Appellees.

No. 43648.

JANUARY 12, 1937.

REHEARING DENIED MAY 17, 1937.

G. C. Dalton and Richard D. Rudolph, for appellant.

Swan, Martin & Martin and Roscoe Jones, for appellees.

RICHARDS, C. J.—On March 20, 1933, plaintiff signed a note and mortgage for five thousand dollars payable to defendants, and a note for three hundred dollars payable to defendant Lillian Iebsen, and also canceled and surrendered to defendants a four thousand dollar note which defendants had signed and given plaintiff for money borrowed on December 31, 1928. In the instant suit in equity plaintiff prays that the five thousand dollar note and mortgage and the three hundred dollar note be canceled and annulled and that the cancellation of the four thousand dollar note be set aside and that plaintiff have judgment on the four thousand dollar note against defendants. The trial court dismissed plaintiff's petition, and he has appealed.

As one of the grounds for the relief sought plaintiff alleges that wrongful threats made by defendants brought about plaintiff's signing of the two notes and mortgage and plaintiff's cancelling of the four thousand dollar note, while plaintiff was so

fearful and shocked by reason of such threats that he was precluded from exercising his own free will and judgment. Upon this issue of duress the following evidence is in the record.

At the time of the trial, December, 1935, the ages of the parties were the following: Plaintiff 67 years, defendant Lillian Iebsen 35 years, defendant George Iebsen 53 years. When 13 years old plaintiff emigrated with his parents from Germany, coming to Cass county, Iowa. He has ever since lived in the vicinity of Atlantic in that county. He attended school six years in Germany, but during only two months in this country. He was without knowledge of the English language when he left Germany. His lifelong occupation has been farming. He married and has two adult sons. Plaintiff's wife, who was a sister of defendant George Iebsen, died in September 1928. At that time plaintiff's accumulations included two or three farms in Cass county. After losing his wife plaintiff ceased maintaining a household of his own and quit active farming March 1, 1929. A part of the time he lived in the family of one of his sons. In March, 1933, he was living and paying board in the home of one Turner, a tenant on one of his farms. For a couple of months in first part of 1930 plaintiff was at the home of defendants on the 120-acre farm belonging to defendant George Iebsen, seven miles north of Atlantic, doing chores and assisting Iebsen in his farm work. Again in 1931, at the request of defendants, plaintiff was at their home several weeks, doing the necessary work and chores, defendant George Iebsen being incapacitated by illness. On other occasions plaintiff was requested to come to defendants' home and usually complied. In 1932 plaintiff was at defendants' home from March until in the fall, doing farm work and chores in the manner of a farm hand, filling the gap occasioned by Iebsen being employed a part of the time in work on the public highways. During these periods defendants appear to have been more or less in financial straits with outstanding debts and it is the only fair inference from the record that it was defendants' apparent need and desire for assistance, and plaintiff's friendly willingness, that moved plaintiff at various times to be at defendants' farm filling in considerable measure the place of a hired man. Nothing has been found in the record to indicate whether or not plaintiff received any pay or wages. The 120-acre farm on which defendants resided was the old family place where George Iebsen had always lived. There, at

all times following their marriage in January, 1922, the defendants have maintained their common household. Two children born in 1922 and 1924 were members of the family.

On Sunday, March 19, 1933, between ten and eleven o'clock a. m., defendant George Iebsen appeared at the door of the residence on plaintiff's farm about four and one-half miles west of Atlantic, where plaintiff was boarding with the tenant Turner. The door was opened by Turner in response to defendant's knocking. Though invited to come in Iebsen did not enter the house but stated he wished to see plaintiff. Plaintiff, informed of the request, stepped outside onto the porch. Iebsen then exhibited to plaintiff a letter which defendant Lillian Iebsen had written. There was also a conversation, a part of which Turner testifies he heard through a broken window, near which Iebsen and plaintiff were standing. It is Turner's testimony that he heard Iebsen say that he, Iebsen, wanted $10,000 because plaintiff had been keeping company with Iebsen's wife, and that if it was not paid defendant Lillian Iebsen was going to put up little notes around and then commit suicide, and that the neighbors would then come down and hang plaintiff. Turner also testified he heard Iebsen say that he would send plaintiff to jail, unless the $10,000 was paid. Defendant George Iebsen testifying later in the trial, stated on cross-examination that Turner in his testimony had correctly given and described the statements that were made by Iebsen in the talk on the porch. On re-direct examination there was the following:

"Q. Yes, do you recall what Mr. Turner's testimony was as to what he heard? A. Well, I presented him a note, and demanded so much money.

"Q. That is the part you recall Mr. Turner said. A. Yes sir. "Objected to for the reason it is leading and suggestive."

After this conversation had continued for about five minutes Iebsen and plaintiff went to Iebsen's car that was at a little distance and the two remained in the car for about an hour. Plaintiff then returned to the house and Iebsen drove eastward. At about 1:30 p. m. on the same day Iebsen returned in his car accompanied by defendant Lillian Iebsen. For the second time Iebsen came to the door of the Turner home. To Mrs. Turner, who opened the door, Iebsen said he wanted plaintiff to come outside. Plaintiff came out of the house, and was asked to come

to the car, inside which Lillian had been waiting. Plaintiff went to and entered the car and defendant George Iebsen drove up the road about sixty rods from the house. Plaintiff and the two defendants there remained in the car thirty or more minutes. Plaintiff then walked back to the house and defendants drove eastward toward Atlantic. The day was cold, snow was deep and falling, the storm being described by the witnesses as "blizzardly". In a little while after plaintiff had returned to the house Turner and his wife accompanied by plaintiff, in Turner's car, were driving eastward toward Atlantic. When within about a mile of that town they met the defendants in their car returning toward the Turner home. As the Turner car approached them defendants slowed down and stopped. It is disputed whether Iebsen made a signal that the Turner car also be stopped. But the Turner car did stop, close to the Iebsen car and plaintiff entered the Iebsen car which was then driven westerly. Turner and wife continued their trip easterly into town. Sometime later the Iebsen car stopped at a point about a quarter or one-half mile from the home of plaintiff's son. Thence plaintiff walked to the son's home. In about the middle of the following day plaintiff went to Atlantic. Defendants did likewise, and in defendants' car, standing at the curb of one of the streets of that city, plaintiff signed the two notes in question and canceled and surrendered the four thousand dollar note. During the transaction defendants sent plaintiff from the car to a bank to procure blank notes and it was defendant Lillian Iebsen who filled in the written portions of the notes excepting plaintiff's signature. She also wrote out on a separate piece of paper the form of cancellation of the four thousand dollar note which form plaintiff then copied in his own handwriting on the back of that note. After defendants had obtained the two notes they said to plaintiff that the five thousand dollar note was not good because not secured and that he should execute a mortgage. Thereupon Iebsen and plaintiff went to an attorney's office where Iebsen stated that their business was the drawing up of a mortgage. It was drawn, signed and acknowledged by plaintiff, and taken away by Iebsen. Concerning what was said inside defendants' car on the three occasions described there is of course great conflict. Plaintiff claims that threats continued as those related by Turner and in addition that defendants said they would have plaintiff arrested and sent to the penitentiary unless

their demands were met, in which latter event they would keep secret the entire affair. Defendants deny much of this. But it is uncontroverted that defendants were accusing plaintiff of being the father of the unborn child of defendant Lillian Iebsen. She gave birth to the child eight days later, on March 27th. It is also undisputed that plaintiff did not accede to defendants' demands until after defendants had returned the third time and were conveying plaintiff toward the west.

Much of the defendants' evidence seems to have been offered to establish that plaintiff was the father of the unborn child. Over objection defendant Lillian Iebsen testified that she had intercourse with plaintiff upon a single occasion in the latter part of June or early part of July, 1932, following expressions of sympathy and flattery on part of plaintiff. Likewise over objection she testified that she had not permitted her husband to have access to her person for a period of two or three years prior to July, 1932, although defendants maintained a household in common and apparently were living as husband and wife. She also testified that in September, 1932, she advised plaintiff that she was pregnant and that plaintiff paid little attention and said she should tell her husband about it. She also testified to promises made by plaintiff of financial assistance. There was also offered, over objection, the testimony of a physician that in his opinion defendant George could not have been the father of the child, the opinion being based on a test he had made of the blood of the child and of the two defendants. On the other hand, over objections of defendants, a witness, residing in defendants' vicinity, testified that in 1929 defendant George Iebsen had asked him whether he would like to have sexual relations with Iebsen's wife and, over objections, another witness from the neighborhood testified that he did have intercourse with defendant Lillian Iebsen. Counsel did not cross-examine the latter witness, and in argument relies on the proposition that the testimony is immaterial because the witness did not show that the alleged happening was at about the time of the conception of the child in question.

﹝A contract obtained by so oppressing a person by threats regarding his personal safety or liberty as to deprive him of the free exercise of his will and prevent the meeting of minds necessary to a valid contract, may be voided on the ground of duress. This is true whether the oppression, causing the incom-

petence to contract, be produced by what was deemed duress formerly, and relievable at law as such, or be wrongful compulsion, remediable by an appeal to a court of equity. ''The law no longer allows a person to enjoy, without disturbance, the fruits of his iniquity, because his victim was not a person of ordinary courage, and no longer gauges the acts that shall be held legally sufficient to produce duress by any arbitrary standard, but holds him who, by putting another in fear, shall have produced in him a state of mental incompetency to contract, and then takes advantage of such condition, no matter by what means such fear be caused, liable at the option of such other to make restitution to him of everything of value thereby taken from him.'', Bank v. Loos, 142 Iowa 1, 120 N. W. 317, 320; Kaus v. Gracey, 162 Iowa 671, 144 N. W. 625; Gray v. Shell Petroleum Corp., 212 Iowa 825, 237 N. W. 460. With respect to threats of arrest for commission of some offense, ''It is not necessary in this state that the threat be of unlawful arrest; that is to say, it does not matter whether the person threatened be guilty or innocent. Smith v. Steely, 80 Iowa 738, 45 N. W. 912; Giddings v. Iowa Sav. Bank, 104 Iowa 676, 74 N. W. 21; Henry v. State Bank, 131 Iowa 97, 100, 107 N. W. 1034, and cases cited; Joyce Co. v. Rohan, 134 Iowa 12, 14, 111 N. W. 319, 120 Am. St. Rep. 410.'' Kwentsky v. Sirovy, 142 Iowa 385, loc. cit. 399, 121 N. W. 27, 32. In view of the foregoing, the determining question is not whether plaintiff was guilty of the offense of which he was being accused by defendants. The salient questions are, first, were these wrongful threats made as claimed by plaintiff, and second, if the threats were made, did they induce plaintiff to do the things he did under influence of such fear as deprived him of the free exercise of his will and prevented the meeting of minds necessary to a valid contract?

As to whether the threats were made the evidence is in conflict, defendants denying utterance. But a reading of the record leads to but one reasonable conclusion, namely, that the threats were made. The defendant George Iebsen admits that he went to the Turner home to see whether he could draw ten thousand dollars out of plaintiff. He says that was his purpose. He testifies that the things said to plaintiff were the things he thought he had to say in order to bring him across. He heard the testimony of plaintiff's witness Turner which is above set out in this opinion. Later in the trial, when Iebsen as a witness

was being cross-examined, he testified that Turner in his testimony gave correctly the statements and just what was said between George Iebsen and plaintiff while they stood on the porch. The re-examination of Iebsen on this matter, as above set out, is not impressive to a searcher for the facts, because in the re-examination statements of importance in the cross-examination were touched on so uncertainly and casually, and because the question eliciting the answer was so leading and so suggestive to the witness. There is also the testimony of plaintiff. The record compels a finding of utterance of the threats.

We turn to the question whether the threats induced plaintiff to do the things he did under influence of such fear as to produce in him a state of mental incompetency to contract. In weighing the testimony there is to be taken into consideration the mentality, capacity, age, sex and other characteristics of the person threatened, the relation of the parties, and the material attendant circumstances shown in the record, Foote v. De Poy, 126 Iowa 366, 102 N. W. 112, 68 L. R. A. 302, 106 Am. St. Rep. 365. Reconstructing, with these aids, the actual occurrence, the inquiry is, what was the state of mind of plaintiff? What they observed as to plaintiff's seeming state of mind is described by several witnesses. It is their testimony that following the occurrence between plaintiff and defendants, plaintiff did not appear to be the same person. He became silent and "blue", was nervous and upset and was without appetite for food; that his mind was "away off"; that plaintiff was a changed man, whereas previously he was characteristically happy and cheerful and talkative. Turner and his wife testify this change dated from the Sunday occurrences above described. They and other witnesses testified the change in plaintiff was continuous thereafter. There is no direct contradiction concerning these things claimed to have been observed by these witnesses. There is the evidence of plaintiff himself that he was frightened and scared by the threats to an extent that he did not know what he was doing, and continued thereafter to be frightened, scared and nervous, and unable to sleep. Plaintiff testified that he had not fully recovered from the shock caused by the threats even at the time of the trial; that defendants had him so frightened he would have signed anything to settle and keep from going to the penitentiary; that he lost all control of himself on account of the frightened condition in which the threats placed him; that if

it hadn't been for the threats he would not have entered into the transaction. The manner of the making of the demands by defendants lends some weight to plaintiff's claim that it was fear from the threats that controlled his actions. The transaction at the time of the first appearance of Iebsen on this Sunday failed to move plaintiff. The second attempt failed. But evidently resolute to accomplish their purpose the defendants were returning again on this Sunday, when they met the Turner car. Then for the third time within a few hours plaintiff was subjected to defendants' apparent determination to have the money or execute the threats. Such was the pressure that brought about plaintiff's apparent consent. It is material that plaintiff's opportunities had not been those of a native born person who has acquired at least a public school education. His activities had been confined to the business of farming. In the testimony of defendant George Iebsen is indication that plaintiff was a man of good intentions, and kindly disposition, and helpful to Iebsen during a course of many years. The threats came from those for many years befriended. That fact would easily render defendants' attack by threats more shocking and confusing to plaintiff. There is also a showing shedding perhaps a little light on plaintiff's susceptibility, evidence that on at least one previous occasion he had yielded to salesmen offering stocks that turned out to have been of little or no value. The investment was $10,000. Whether defendant had knowledge thereof does not affirmatively appear. With reference to the threat that Lillian Iebsen would post up notes and then commit suicide with the result that the neighbors would come down and hang plaintiff, it may be said that this particular threat could well have impressed plaintiff as a thing more sinister than appears in its mere recital. For it was only two or three months previously that a sister of Lillian Iebsen had in fact taken her own life. Another element of the situation was the fact that, aside from any liabilities growing out of the claimed relations of plaintiff with Lillian Iebsen, there was admittedly no debt or money owing by plaintiff to defendants and also admittedly the defendants were without money to pay the $4,000 of borrowed money that they were owing plaintiff. The transaction itself has earmarks of the extraordinary. It does not have appeal as a thing in line with the manner in which men, not under undue influence, ordinarily alienate money in ten thousand dollar amounts.

1124

Defendants point out that plaintiff sought neither aid nor advice when he with Iebsen was in an attorney's office, and that between the Sunday occurrences and the execution of the papers on the following day plaintiff had opportunity to consult with Turner, or with his son or with any other person. Defendants say these facts prove that plaintiff was not being wronged or coerced, because if such were the case he would have consulted with someone for his protection. The proposition is based on the usual human reaction to threats and dangers, that is the impulse to escape. Had the thing threatened been future physical violence from defendants, and nothing more, possibly it would have been natural for plaintiff to seek aid, for instance, by having defendants physically restrained, because such course might suggest itself as a means of escape from the threats. But in the instant case the things threatened were not such that hope of escape lay in restraining or antagonizing defendants. From the character of these things feared, escape would naturally appear to depend wholly on quiescence on part of defendants. Had the threats aroused a fighting spirit rather than fear then plaintiff might have sought aid in making a determined resistance. And of course there is the possibility that plaintiff was impelled by his own volition to turn $10,000 over to defendants. But we are convinced from the record that it was fear that dominated. With plaintiff in such frame of mind it would naturally appear to him that seeking aid by publishing these threats to others would not only not afford escape from the things he feared but on the contrary would precipitate them. It appears in accord with common observation of human conduct to conclude that to plaintiff's mind there appeared no escape through seeking aid or advice of others. This seems to be the explanation of his silence. Indeed the considerable period of time that elapsed between the Sunday transaction and the revealing by plaintiff of these matters to those on whom he would naturally rely, and the record before us, compels the finding not only that fear inspired by the threats precluded plaintiff from exercising his own free will, but that plaintiff was effectually controlled by such fears for long thereafter. Five months or thereabouts elapsed before plaintiff revealed these transactions to his sons. They advised him to take some action. But from the record we are lead to believe that plaintiff was still in such a state of fear that it was not for perhaps a year after the Sunday in question that he

first sought legal advice. Defendants seek to counter these facts by showing that within about a week after the Sunday transaction there were conversations between plaintiff and a sister of defendant George Iebsen and her husband. · The manner of happening of these conversations is material. Defendant's sister and brother-in-law had approached plaintiff to have the conversations and were seeking to question him. They were admittedly hostile to plaintiff and were then involved in a controversy over a five thousand dollar note on which they were being sued by plaintiff. It also appears that on the Sunday in question defendant Iebsen on his first trip toward the Turner home had stopped at his sister's home and had discussed with this brother-in-law the project on which Iebsen was then embarking. The testimony of defendant's sister and brother-in-law does not exhibit desire or willingness on plaintiff's part to seek aid or advice or to reveal to anyone the threats that had been made, nor do we find therein any substantial inference that plaintiff had not been coerced.

Defendants urge that plaintiff cannot prevail because his payment to defendants of $25 in April and $50 in June, 1933, amounted to a ratification. Defendants also claim plaintiff is guilty of laches because the instant case was not begun until May 26, 1934. But the so-called ratification and the delay in bringing the suit appear to us to have been brought about by the thoroughness of the fear that defendants had inspired in plaintiff's mind, and its consequent long continuance. That the state of fear may continue long after the threats that cause it and is even presumed to have lasted for some appreciable length of time is recognized in our decisions. Kwentsky v. Sirovy, 142 Iowa 385, 121 N. W. 27; Henry v. State Bank, 131 Iowa 97, 107 N. W. 1034; Smith v. Bank, 182 Iowa 1190, 164 N. W. 762.

Defendants' plea of the statute of limitations cannot be sustained. Additional grounds of plaintiff's petition need not be discussed. The record establishes duress. Plaintiff should have been accorded the relief sought in his petition. The case is reversed, decree to be entered in the district court in accordance with this opinion.—Reversed.

HAMILTON, DONEGAN, ANDERSON, PARSONS, KINTZINGER, and STIGER, JJ., concur.