In re the MARRIAGE OF W. P. and
Necia A. HITCHCOCK.

Upon the Petition of W. P. HITCHCOCK,
Appellee, and concerning Necia A.
HITCHCOCK, Appellant.

No. 60316.

Supreme Court of Iowa.

April 19, 1978.

Rehearing Denied June 23, 1978.

Richard A. Malm and Michael J. Galligan, of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for appellant.

J. Rudolph Hansen, of Hansen, Wheatcraft & McClintock, Des Moines, for appellee.

MASON, Justice.

Respondent, Necia A. Hitchcock, appeals from the economic provisions of a decree granting petitioner, W. P. Hitchcock, dissolution of his marriage to Necia and from the order overruling her motion to vacate and for new trial.

September 24, 1975, Mr. Hitchcock filed a petition in the Polk District Court for dissolution of his marriage with Necia A. Hitchcock. August 17, 1976, the action came on for trial before Judge Missildine. After hearing part of Mr. Hitchcock's testimony, the court urged the parties to attempt to settle the economic matters of the dissolution. They settled and the court entered a decree August 19 in the form submitted and approved by counsel for the parties. August 27 Mrs. Hitchcock, through attorneys she had hired after the decree was entered, filed a motion to vacate the judgment and for a new trial alleging that her consent to the purported settlement was procured by undue duress upon her as a proximate result of the trial court's conduct. After an evidentiary hearing on the motion before Judge Gibson C. Holliday, the motion was overruled.

In the part of the decree from which appeal is taken the court ordered Mr. Hitchcock to pay Mrs. Hitchcock $1500 a month alimony to continue until either party dies

or Necia remarries. She was to be the owner of the equity in the couple's house and Mr. Hitchcock was to pay the mortgage payments for as long as Necia retained title to the house and as long as she continued to occupy the home at least 11 months a year. Mr. Hitchcock was ordered to pay Mrs. Hitchcock $50,000 in equal yearly installments over a five-year period. She also received the household furniture, her checking and savings accounts, and all insurance policies of which she was the owner. Mr. Hitchcock received the remainder of the property including his stocks and other interests in Davis Brokerage Company.

When the parties were married in 1947 they had no substantial property. In 1948 Mr. Hitchcock went to work as a salesman for Davis Brokerage Company, a food brokerage firm with its principal office in Des Moines. In 1951 he was transferred to Davenport and eventually became the office manager there. In 1965 he returned to Des Moines as vice president of the company. In 1970 he was made president of the company and has since continued in that office.

In 1971 the founder of the company, John Davis, sold his 40,040 shares in the company to the company at $10 a share. Pursuant to an agreement with Davis, the company has paid him a portion each year of the $400,400 it owes him so that by the time of trial the company owed him $200,000.

As of December 31, 1975, Mr. Hitchcock owned 8285 shares in the company which amounted to seventy-six percent of the outstanding shares of stock and which gave him control of the company. His salary as president was $60,000 a year plus a bonus which would be paid if the company made money. In 1975 he had been paid a bonus of $16,000.

The parties disputed the value of Mr. Hitchcock's shares in the company. Although the valuations of the shares ranged from $2,000,000 to $400,000, most of the experts the parties intended to call as witnesses placed the value between $400,000 and $600,000.

Under an agreement between Mr. Hitchcock and the company, the company agreed to buy back his shares of stock upon his death or retirement for no less than $407,000. In addition, in the event of Mr. Hitchcock's death or retirement the company agreed to pay a total of $100,000 in equal monthly installments over a period of 120 months to him or to his designated beneficiaries or to his estate. In the event he was forced to terminate his employment because of disability, he was to be paid $3400 a month until he reached age 65. The company secured its commitment under this agreement with a life insurance policy on Mr. Hitchcock.

Apparently the stock was difficult to value because the value of the company could not be easily determined. The company's only real assets were its customers who could cancel their contracts with the company on 30-day notice. If the company lost a big customer it could lose money for the year. The profits of the company were entirely dependent upon the persuasiveness of its salesmen and officers.

While Mr. Hitchcock was busy rising through the ranks of Davis Brokerage, Mrs. Hitchcock was busy at home. While he worked to earn money, she worked to maintain their home and family. The couple had one daughter who at the time of trial was 25 and lived with her mother. Mrs. Hitchcock had no specialized training to help her to obtain employment. Although her age was stated at trial to be 56, the same as her husband, she was actually 63.

Prior to trial both parties disclosed the value of their assets. These assets, excluding the stock in Davis Brokerage, were as follows: (1) a jointly owned house worth fifty to sixty thousand dollars and encumbered by a twenty thousand dollar mortgage; (2) household goods and furniture worth ten to twenty thousand dollars; (3) two automobiles which together were worth $3150; (4) Mr. Hitchcock's vested interest in the company pension plan, $45,000; (5) two savings accounts, one in Mr. Hitchcock's name and one in Mrs. Hitchcock's name, with balances of $3500 and $2400 respec-

tively; (6) 300 shares of stock in Mr. Hitch-cock's name worth $600; (7) a coin collection worth $4000; and (8) 14 life insurance policies having a face value of $111,548 and cash surrender value of $20,000, each listing Mrs. Hitchcock as primary beneficiary and some listing their daughter as contingent beneficiary.

The parties also listed their expenses. Mrs. Hitchcock's expenses for herself and her daughter totaled $25,148.45 a year. She also indicated mortgage payments, taxes and insurance on their home amounted to $3192.00 a year.

Mr. Hitchcock listed his expenses as $40,-488 a year, $12,000 of which was money he hoped to invest in a trust to assure continuation of alimony payments to Mrs. Hitchcock after his retirement.

At trial the first and only witness ever called was Mr. Hitchcock who was examined until the court recessed for lunch. After lunch Mrs. Hitchcock and her attorney, Donald F. Neiman, were standing in the corridor when Judge Missildine came in. The judge asked Mr. Neiman if he and Mr. Hitchcock's attorney, J. Rudolph Hansen, could join him in chambers when Mr. Hansen returned from lunch. Upon Mr. Hansen's return, the attorneys met with the judge in his chambers.

The parties and their attorneys dispute what happened from this point on. The accounts of what occurred were brought out in the hearing before Judge Holliday on Mrs. Hitchcock's motion to vacate the judgment entered by Judge Missildine and for a new trial.

## MR. NEIMAN: DIRECT EXAMINATION

In chambers Judge Missildine said he did not wish to sit and listen to how to run a brokerage business. He felt the attorneys knew more about it than he did. From what he had observed the parties appeared to be only a couple hundred dollars apart and he thought they should get together and try to work out a settlement.

The judge offered to speak to the parties if that would help. Mr. Neiman then stated he and Mr. Hansen had been working on the case for 18 months and they would both welcome any outside help. He could not remember the judge having said anything about not wanting to know the value of the Davis Company stocks.

After the meeting he returned to his client and told her the judge would like to speak with the parties. He explained to her he had the impression the judge was not going to give her any part of her husband's business.

At the meeting with the parties and their attorneys the judge repeated what he had said to the attorneys about the possibility of settlement. Mrs. Hitchcock stated she felt that after twenty-eight and one-half years she was entitled to some part of the business. The judge explained she was not entitled to any part of the business because the business was personal to her husband. It was the business that had afforded them the life to which they had become accustomed and it was the business which would produce the money with which Mr. Hitchcock would pay the alimony. The judge intended to give her the same standard of living as that to which she had become accustomed.

Upon conclusion of this meeting, Mr. Neiman met with his client again. She appeared shocked, was trembling and was almost to the point of tears. He explained to her he did not believe the judge's comments were grounds for a mistrial. He thought they should settle the case because if they went on she could possibly get less alimony than he thought her husband was willing to pay. He based this conclusion on an earlier offer of settlement and on his impression of the attitude of the court toward giving Mrs. Hitchcock a part of the business.

Mr. Neiman then entered into negotiations with the other side. After one and one-half hours a settlement was reached. He did not know why Mrs. Hitchcock had agreed to settle the case but he surmised it was because of the attitude of the court.

## MR. NEIMAN: CROSS–EXAMINATION

He had explained to Mrs. Hitchcock prior to trial there was little chance a judge

would give her any part in the business. He felt a judge would not lend much credence to their witness who would testify the business was worth $2,000,000.

During the negotiations prior to the settlement, the judge told Mr. Neiman if they could not get it settled he was ready to continue to hear the evidence. The judge also went out and told the parties to come back in and get on with the evidence. Mr. Neiman then suggested something could be done if he had more time to speak with his client.

Mr. Neiman felt he had settled the case because he could get a better deal for his client than if he tried the case. He had explained the details of the settlement to Mrs. Hitchcock but stated she might not have understood because she was very disturbed by the whole turn of events. He felt the settlement was fair.

### MRS. HITCHCOCK: DIRECT EXAMINATION

Mr. Neiman came out of the meeting between the attorneys and the judge in a very disturbed state. He explained to Mrs. Hitchcock the judge was not going to consider the value of the business. Upon hearing this she became very agitated.

At the meeting with the parties the judge explained he thought the business was a male type achievement. He explained to her she had no right to anything except to live as she had been accustomed. She was dumbfounded and shocked to hear this. She felt he was not listening to her and had prejudged her.

The judge explained he did not care to learn how a brokerage business was run. He thought the lawyers and parties should try to work out some sort of agreement.

After the meeting Mrs. Hitchcock returned to the corridor. She was shocked and felt frustrated, trapped and under duress. Some of her agitation was caused by things her husband had told her.

Mrs. Hitchcock could not remember what happened next. During the negotiations between the attorneys, she told Mr. Neiman what she wanted but did not recall whether he had kept her informed. The judge came out about 3:00 p.m. and told the parties he did not want to be there all night. Mrs. Hitchcock then asked for another five minutes and the judge went back into the courtroom.

She had agreed to a settlement but had not approved the final figures agreed upon by the attorneys. She did not know the details of the settlement until after the court's decree was entered. She was not satisfied with the settlement.

### MRS. HITCHCOCK: CROSS–EXAMINATION

During the negotiations she knew she would have title to the house and that her husband would make the mortgage payments. She understood her husband would pay her $50,000 over a five-year period. She was aware she would get $1500 a month alimony. She admitted the only way her husband could pay the alimony was if he kept the business.

Mrs. Hitchcock was aware the judge told her he would hear the case if the parties could not settle it. She asked him for five minutes more.

When she stated she was under duress, she meant she was being forced to make a decision she should not have made. The circumstances had forced her into this position. Mental force had been exerted upon her. Her shock was caused by her realization that things were happening differently from what she had imagined.

### JUDGE MISSILDINE: DIRECT EXAMINATION

He explained to the attorneys it appeared to him the case could be settled and suggested they take some time to attempt to do so. He felt they were better versed in the facts of the case than he would be at the close of all the evidence. He stated his attitude toward the type of case presented here:

" 'Whenever there is substantial property involved, I would much rather have a set-

tlement than a decision of the Court, because the Court can only decide a case on the evidence that is before it, and he has to determine which witnesses he is going to believe where there is a conflict,' and so on. So it is my opinion and my philosophy, wherever there is substantial property involved, a settlement is much better than any decision the Court can give them, and I told them that."

## JUDGE MISSILDINE: CROSS–EXAMINATION

It was his impression at the trial the brokerage business was a personal one because its success depended on the person who was the head of the business. He did not recall telling Mrs. Hitchcock she had no right to any part of the business.

## MR. HITCHCOCK

The judge stated he felt the people involved in the case knew more about it than he did. The judge stated the value of the business was its ability to support the parties well and as long as it served that purpose, that was how the parties should value it. It is true the judge urged the parties to settle but he did not give any impression of coercion.

Judge Holliday overruled the motion to vacate and for new trial. He found the comment of the judge urging settlement was " * * * without bias or prejudice toward either party. The comment was made in a desire to give counsel for the respective parties 'an expression of the conclusions of the Judge up to the moment, in order that counsel may be advised what course to chart.' " He concluded there was no error, irregularity or misconduct. He did not consider whether the economic provisions of the decree were equitable.

In his conclusions of law Judge Holliday stated:

"Efforts on the part of the trial judge to expedite the proceedings and to encourage settlements out of Court are ordinarily to be commended, such efforts should never be so directed as to compell [sic] either litigant to make a forced settlement.

"The rule is well established that, within proper bounds, a trial judge should encourage the settlement of litigated cases. The question here is whether the judge's comments were within such bounds.

"A party or his counsel may always refuse to accede to a suggestion by the court. The trial court ought not to force a settlement on a party who wants a trial, but there is nothing wrong or irregular in the Court suggesting the advisability of settlement. A settlement procured under duress cannot be binding.

" * * *

"The record does not reveal any evidence of coercion, bias, or prejudgment on the part of the Court. On the contrary, the Court exercised a high degree of courtesy and patience, and at all times appeared to maintain an open and unprejudicial attitude.

"This Court concludes that the record does not present a situation which calls for a holding that the trial judge was guilty of misconduct which requires the granting of a new trial."

I. The issue presented by Mrs. Hitchcock's appeal from the economic provisions of the final judgment and decree terminating the marital relationship existing between her and her husband is whether the award in those respects is justified and equitable.

Section 598.21, The Code, as in force at the time material here, provided:

"Alimony—custody of children—changes. When a dissolution of marriage is decreed, the court may make such order in relation to the children, property, parties, and the maintenance of the parties as shall be justified.

"Subsequent changes may be made by the court in these respects when circumstances render them expedient."

In *Locke v. Locke*, 246 N.W.2d 246, 251 (Iowa 1976), this court said:

"A distribution of the assets of the parties in a dissolution proceedings should be

based on the guidelines set out in *Schantz v. Schantz*, 163 N.W.2d 398, 405 (Iowa 1968), excluding consideration of reward or punishment on the basis of fault. *In re Marriage of Winter*, 223 N.W.2d 165, 169 (Iowa 1974). See *In re Marriage of Cooper*, 225 N.W.2d 915, 919 (Iowa 1975).

"Division of assets of parties in dissolution of marriage proceedings based on either a one-third share to wife or an equal division is not statutorily sanctioned; that which is determinative is that which would constitute an equitable and just award under the circumstances. See *In re Marriage of Cooper*, 225 N.W.2d at 919."

As pointed out by Mrs. Hitchcock, the decree in this case is not the result of a trial on the merits or an independent decision of the court. There was no written stipulation of the parties which was incorporated in and made a part of the decree in this matter. Rather, the decree entered by the trial court was in the form submitted and approved by counsel for the parties.

Within a few days after entry of the decree Mrs. Hitchcock filed a motion to vacate the decree and for a new trial. As a basis for the relief sought in the motion Mrs. Hitchcock alleged that her manifestation of assent to the settlement referred to in the decree was procured by undue duress and emotional stress induced by the trial judge's conduct in announcing his views as to what would be a just and equitable distribution of the assets of the parties under the circumstances. She further alleged she had no reasonable alternative to succumbing to the purported settlement.

As we understand, Mrs. Hitchcock insists her manifestation of assent to the purported settlement was induced by the acts and conduct of the trial judge and consequently was not effective as an expression of mutual assent necessary for the formation of a valid contract of settlement.

As stated, Judge Holliday in ruling on Mrs. Hitchcock's motion to vacate and for new trial concluded the record before him did not present a situation which called for a holding that the trial judge was guilty of misconduct which required the granting of a new trial. He specifically stated, " * * * [T]his Court does not consider the matter of the equities of the decree before the Court."

In our opinion, the question as to whether Judge Missildine's announcements relative to distribution of the assets of the parties constitutes misconduct requiring a new trial is not the issue for determination in Mrs. Hitchcock's appeal from the economic provisions of the decree.

In view of the fact there was an actual expression of assent by Mrs. Hitchcock to the distribution of the assets of the parties as set forth in the decree, the problem before this court is whether the announcements and conduct of the trial judge were sufficient to actually induce assent on the part of Mrs. Hitchcock who claims to be the victim of duress thereby rendering it inequitable to permit enforcement of the distribution as provided in the decree.

The test is subjective. Hence, "threats that would suffice to induce assent by one person may not suffice to induce assent by another. All attendant circumstances must be considered, including such matters as the age, background and relationship of the parties. * * * Timid and inexperienced persons are particularly subject to threats, * * *. However, * * * circumstantial evidence may be useful in determining whether a threat did, in fact, induce assent." See Restatement, Second, Contracts, section 317, comment c (Tentative Draft No. 12).

In our de novo review we are limited to a record of Mr. Hitchcock's testimony, the financial statements filed by the parties prior to trial (section 598.21) and the testimony of Mrs. Hitchcock, her counsel, Judge Missildine and Mr. Hitchcock relative to the events following the noon recess up until the purported settlement. Thus limited we find the announcements and conduct of the trial judge at the noon recess relative to what he considered to be a just distribution of the assets of the parties actually induced Mrs. Hitchcock's manifestation of assent to the purported settlement.

In this connection we recognize duress may be exercised by one who is not a party to the contract as well as by one who is. See Introductory Note to Topic 2, Restatement, Second, Contracts (Tentative Draft No. 12).

In section 317, comment b, *id.*, it is stated that, "A threat, even if improper, does not amount to duress if the victim has a reasonable alternative to succumbing and fails to take advantage of it." In the brief and argument filed on behalf of Mr. Hitchcock reference is made to the fact that while negotiations were in progress Judge Missildine told Mr. Neiman if they could not get the matter settled he was ready to continue to hear the evidence; at a later time Judge Missildine also told the parties to come back in and get on with the evidence. At this point Mrs. Hitchcock asked for another five minutes which the judge granted.

Under the record a finding would be justified that during the noon recess Judge Missildine announced his views as to what would constitute a fair and just distribution of the assets of the parties. The alternative for Mrs. Hitchcock was to follow the judge's suggestion and settle the matter in accordance therewith or proceed to try her case on its merits before a tribunal which had apparently prejudged the issue to be determined by the court as mandated by section 598.21, The Code. In our opinion, this is a far cry from a *reasonable* alternative as contemplated by the Restatement. We agree with Mrs. Hitchcock she did not have a reasonable alternative to succumbing.

Insofar as we are able to determine from the record the remarks attributed to Judge Missildine were made by the judge in the presence of both parties and their counsel.

From our de novo review we conclude the purported settlement relative to the distribution of the assets of the parties as set forth in the decree is voidable by Mrs. Hitchcock. It cannot logically be maintained that she ratified the settlement agreement in any manner or to any extent, particularly in view of her promptness in filing the motion to vacate.

" * * * Ratification results if the party who executed the contract under duress accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or void it. * * * [citing authorities]." *Gallon v. Lloyd-Thomas Company*, 264 F.2d 821, 826 (8 Cir. 1959), 77 A.L.R.2d 417, 424.

We hold the distribution of the assets of the parties as set forth in the decree cannot be sustained.

The legal concept of duress is dealt with in *Galusha v. Sherman*, 105 Wis. 263, 81 N.W. 495, where the history of the concept is traced in some detail.

This court considered the matter briefly in *Guttenfelder v. Iebsen*, 222 Iowa 1116, 270 N.W. 900, and again in *In re Estate of Dayton*, 246 Iowa 1209, 71 N.W.2d 429. See also *Joyce v. Year Investments, Inc.*, 45 Ill.App.2d 310, 196 N.E.2d 24; *Tallmadge v. Robinson*, 158 Ohio St. 333, 109 N.E.2d 496; 13 Williston on Contracts, (Jaeger, Third Ed.), sections 1601–1624; and Restatement, Second, Contracts, sections 316–319 (Tentative Draft No. 12). In the last two citations the modern day view of the concept is treated.

II. Ordinarily, in equity matters, such as this, where our review is de novo it is our responsibility to review the facts as well as the law and determine from the credible evidence rights anew on those propositions properly presented, provided issue has been raised and error, if any, preserved in the trial proceedings. While weight will be given to findings of the trial court, this court will not abdicate its function as triers de novo on appeal. *In re Marriage of Jennerjohn*, 203 N.W.2d 237, 240 (Iowa 1972).

In seeking to determine what distribution of the assets of the parties and what allowance for their maintenance would be justified as required by section 598.21, The Code, it would, of course, be necessary to ascertain the value of their property. At no point in the appendix, transcript or ex-

hibits is there evidence which would justify a finding as to such value.

This court was faced with a similar situation in *Lessenger v. Lessenger*, 258 Iowa 170, 175, 138 N.W.2d 58, 61, where the following statements were made:

"We have carefully read and searched the record. * * * The evidence is inadequate as to the essentials to be considered in determining what is 'right' (section 598.-14). We are convinced the questions of child support and property division or lump sum alimony cannot be properly adjudicated under the record before us. As argued by plaintiff's present counsel, who did not represent her at the trial, equity can only be done by remanding this controversy to the trial court for reopening and further evidence on these two vital issues.

"The general rule is where an equity case is not in a condition for a final decree, none will be made by this court, but the case will be remanded. * * * [citing authorities]."

In *Daugherty v. Daugherty*, 260 Iowa 878, 882, 151 N.W.2d 569, 572, it was said:

" * * * Where the evidence is insufficient for the fair de novo determination of an important issue, we can and should return the case for more evidence on the subject. * * *." See also *Locke v. Locke*, 246 N.W.2d at 253.

We conclude this case must be remanded for a retrial on the question of the division of the assets of the parties and the question of reasonable support and maintenance of Mrs. Hitchcock as directed in sections 598.17 and 598.21. The decree insofar as it dissolves the marital relationship existing between the parties is not affected by this remand.

There is no merit to any suggestion that Mrs. Hitchcock's contentions relative to her appeal from the economic provisions of the decree were not properly preserved for review by this court.

III. In view of the foregoing determination it is unnecessary to reach Mrs. Hitchcock's appeal from the order overruling her motion to vacate and for a new trial.

IV. Mrs. Hitchcock has filed an application in this court for an allowance for fees for services rendered by her attorneys on this appeal. The application is supported by an itemized statement of the time expended by her attorneys, a paralegal and a law student clerk. It is apparent from an examination of this statement that counsel spent a great deal of time preparing this appeal.

In this connection we direct attention to the fact that this is an appeal, not a proceeding for modification of a decree.

Without in any way attempting to place a valuation on these services or what counsel should be paid, we simply determine what portion thereof should be paid by Mr. Hitchcock. Mrs. Hitchcock should be allowed the sum of $2,000 toward her attorney fees. Any amount due her attorneys above this allowance must be paid by her. Judgment shall be entered in the trial court for the amount allowed by this court.

In reaching our conclusion in this matter we have considered every contention, assertion or argument advanced or urged by either of the parties and find none which persuade us that our decision should be otherwise.

With directions to the trial court to set aside that portion of its decree dealing with the distribution of the assets of the parties and the maintenance of Mrs. Hitchcock and to proceed with a retrial on these issues the case is—Remanded.

MOORE, C. J., and RAWLINGS, UHLENHOPP and REYNOLDSON, JJ., concur.

LeGRAND, REES and HARRIS, JJ., dissent.

McCORMICK, J., takes no part.

LeGRAND, Justice (dissenting).

I do not agree the record in this case supports the conclusion reached by the majority, and I therefore dissent.

Mrs. Hitchcock alleges she was induced to agree to a settlement of the dissolution case

in which she was the respondent because of "gross irregularity and misconduct" by the trial court.

It is interesting to note the background from which these charges arose.

The case came on for hearing as a contested dissolution matter. No minor children were involved; and, of course, fault is no longer a consideration. This left the contestants with only one battleground—property settlement and alimony.

The trial court heard evidence for half a day. After the noon recess, at which time her husband's case had not been completed, the trial court asked to see the parties and counsel in chambers. According to the record, it was then apparent the principal asset was Mr. Hitchcock's interest in a food brokerage business. The trial court suggested the case should be settled. He stated he did not feel Mrs. Hitchcock should have any interest in the business, although it should provide her with the standard of living she had been used to. The judge also made statements to the effect that he wasn't interested in learning how to run a brokerage business and that the parties could make a better settlement than he could make for them.

The parties and counsel then retired to conduct almost two hours of negotiations, during which the court indicated the trial should resume if settlement could not be reached. On one occasion, Mrs. Hitchcock asked for "another five minutes." Eventually a settlement was reached. It provided that Mrs. Hitchcock should have the homestead and that Mr. Hitchcock should pay off the incumbrance, that she should have $1,500.00 a month alimony, and property settlement of $50,000.00 to be paid over a five-year period.

Several days later a decree was entered incorporating this settlement into its terms. Mrs. Hitchcock now repudiates it because of "duress" practiced upon her by the court.

I take it my disagreement with the majority concerns only the particular facts of this case and does not rest upon a difference of opinion concerning the general principles which govern such matters. The law looks with favor upon the settlement of disputes, particularly in family and marital cases. A trial judge may, within proper limits, urge settlement. He is frequently the only catalyst from which successful negotiations may spring. *See Schraeder Iron Work, Inc. v. Lee,* 26 Cal.App.3d 621, 103 Cal.Rptr. 106, 118 (1972); *In re Trust of Dorothy Luria Mintz,* 444 Pa. 189, 282 A.2d 295, 299 (1971); *Chertkof v. Harry C. Weiskittel Co., Inc.,* 251 Md. 544, 248 A.2d 373, 376 (1968); *Gardner v. Mobil Oil Company,* 217 Cal.App.2d 220, 31 Cal.Rptr. 731, 6 A.L.R.3d 1451 (1963). *See also* Annot. 6 A.L.R.3d at p. 1459 (1966).

I accept the proposition that a trial judge should not force parties into agreements they would not otherwise make. The majority says that is what happened here. I say it didn't. Both lawyers welcomed the suggestion that they settle. Mrs. Hitchcock's lawyer testified he and his New York expert had agreed at lunch (before the judge made any suggestion) that the case should be settled because they felt Mrs. Hitchcock couldn't do as well as she expected to. In this connection Mrs. Hitchcock's attorney testified he was willing to settle the case partially because of the fact he had no confidence in his own value expert. The notion to settle did not originate with the judge, and the claim that the settlement was made reluctantly and only in the face of the court's insistence is just not borne out by the record.

It is quite true the trial court stated he felt Mrs. Hitchcock should have no proprietary interest in her husband's business; but he also said the business should afford her the same type of living style she had become accustomed to.

This was not an arbitrary or capricious opinion but was based on the judge's philosophy as to what could best serve the interests of the litigants. The business was a personal-service operation. It had no substantial net worth. Its value could be destroyed by loss of a few key accounts. It was, for all practical purposes, a one-man company. Perhaps this is best reflected by

the testimony of Donald F. Neiman, Mrs. Hitchcock's lawyer, at the hearing to vacate the decree. I set out an excerpt from it:

"Q. After you came back from lunch, will you tell the Court what happened? A. Well, we ran into Judge Missildine, and he indicated he would like to talk to Steve Hansen and myself back in Chambers when Steve got back. During that recess I had lunch with the expert witness from New York, and we discussed the outlook of the case, and this expert witness is also an attorney although he is not familiar with the courtroom, but we both concluded that from the way the evidence was going, as far as the Judge's view of it, that he would never force a sale of Davis Brokerage Company, that there was a possibility that if we could get into it, we should think about possibly settling it. This was right before Judge Missildine—

Q. What made you feel the Judge would not force a sale of the Davis Brokerage Company?

A. It is a going concern that has fifty-five salesmen and has a large sales force. It has three executives that are very key to the business, that if it were sold, there would be no guarantee for any non-competing type of thing, and basically that was what we were looking at.

Q. That was just your private surmise between the two of you?

A. Yes.

Q. The judge hadn't said anything about that?

A. No."

This appears to have been the *real* basis for the settlement. What the judge said later was not the motivating force Mrs. Hitchcock now says it was. Nor did the fact the judge made his remarks without having heard Mrs. Hitchcock's evidence amount, as she claims, to "prejudging" her case. Her testimony could not have changed the nature or character of the business, only its value. This factor played no part in what was said.

I do not quibble about whether some of the judge's remarks might have been better left unsaid or have been couched more judiciously. But when Mrs. Hitchcock's complaints are examined one by one they are so insubstantial that I find no possibility, however remote, she was coerced or that she was the victim of judicial duress.

The court made disdainful reference to an adult daughter as a "freeloader," a remark at which Mrs. Hitchcock took umbrage. However, he did so in the context that this was making Mrs. Hitckcock's alimony requirements greater than they should be.

She also resented the judge's comparison—ill advised, perhaps—of Mrs. Hitchcock's right to an interest in her husband's business to his own wife's interest in his retirement fund should they be divorced.

Another statement with which she found fault was the court's admonition to either settle or get on with the trial because he didn't "want to be here all night." Surely this was little more than a pointed prodding that trial time was wasting, without apparent results.

During all of this, Mrs. Hitchcock had the benefit of her lawyer's counsel as well as the advice of her brother, with whom she is shown to have consulted. I simply cannot accept the majority's conclusion she was forced into an improvident settlement against her will. In fact when she was pressed for proof of such fact, the best Mrs. Hitchcock could come up with was that she felt "trapped" and "frustrated" because the judge didn't "act at all the way they do on TV."

Judge Holliday found Mrs. Hitchcock's application to vacate the decree was groundless. I think that finding should be affirmed.

REES and HARRIS, JJ., join in this dissent.